Lena R. GAINES–TABB,
et al., Plaintiffs,

v.

ICI EXPLOSIVES USA, INC., a Delaware corporation; Imperial Chemical Industries, PLC, a foreign corporation; ICI Canada Inc., a foreign corporation; Doe Corporations 1 through 99; Doe Companies 1 through 99; John Does 1 through 99, and Jane Does 1 through 99, Defendants.

No. CIV–95–719–R.

United States District Court,
W.D. Oklahoma.

July 2, 1996.

Michael M. Blue, John M. Merritt, Merritt & Rooney, Oklahoma City, OK, Johnnie L. Cochran, Jr., Law Offices of Johnnie Cochran Jr., Los Angeles, CA, Sydney Irmas, Los Angeles, CA, for Plaintiffs.

Earl D. Mills, Mills & Whitten, Oklahoma City, OK, Joe B. Harrisson, Gardere & Wynne, Dallas, TX, Mary C. Coulson, Steven J. Adams, Gardere & Wynnne, Tuls, OK, Carl Arthur Henlein, Hollis E. Wright, Brown Todd & Heyburn, Louisville, KY, Katherine K. Yunker, Lexington, KY, for Defendants.

## ORDER

DAVID L. RUSSELL, Chief Judge.

Before the Court is the motion of Defendant ICI Explosives U.S.A. Inc. ("ICI") to dismiss Plaintiffs' Third Amended Complaint pursuant to Rule 12(b)(6), F.R.Civ.P.[1] As grounds for its motion, Defendant ICI asserts that Plaintiffs have not and cannot allege facts showing that any action or inaction of ICI was the proximate cause of the Plaintiffs' injuries; that the sole or supervening cause of the Plaintiffs' injuries was a criminal act committed by terrorists which ICI had no

---

1. On August 16, 1995, Defendant ICI filed a Rule 12(b)(6) motion to dismiss and, because it submitted and relied in part on matters outside the pleadings, alternatively sought summary judgment. Thereafter, Plaintiffs twice amended their Complaint and on August 22, 1995 filed a motion to certify this action as a class action. Upon the joint motions of Plaintiffs and Defendant ICI, the Court abated the deadlines for Plaintiffs' response to Defendant ICI's motion to dismiss; for Defendant ICI's response to Plaintiffs' discovery requests; for Defendant ICI's Answer to Plaintiffs' Second Amended Class Action Complaint; and for Defendant ICI's response to Plaintiffs' motion to certify until after the October 3, 1995 scheduling conference which the Court had previously set at Defendants' request. At the scheduling conference, Plaintiffs informed the Court of their intent to amend their Complaint to join additional parties Defendant. Plaintiffs were granted leave to do so on or before November 1, 1995. No further deadlines were set. Plaintiffs' Third Amended Class Action Complaint, the subject of the motion to dismiss now before the Court, was filed November 1, 1995. Upon De-

fendant ICI's motion, the Court extended Defendant ICI's deadline for responding to the Third Amended Complaint and a further briefing schedule. Defendant ICI's motion has now been fully briefed, Plaintiffs having filed a surreply on April 11, 1995.

Upon separate motions of Defendants Imperial Chemical Industries PLC and ICI Canada Inc., the Court abated the deadlines for those Defendants' responses to the Third Amended Complaint until further order of the Court and granted leave to those Defendants to join in the Rule 12(b)(6) motion to dismiss to be filed by Defendant ICI without waiver of any of the defenses otherwise available to those Defendants under Rule 12(b), F.R.Civ.P. However, neither of these Defendants have joined in Defendant ICI's motion. None of the Defendants have responded to Plaintiffs' motion to certify, but no new deadline for such response was ever requested or set. The Court presumes that all parties herein acquiesce in the resolution of this motion to dismiss prior to a determination of whether this action is to be maintained as a class action.

duty to anticipate or prevent; that Plaintiffs have failed to allege facts showing that ammonium nitrate is defective and unreasonably dangerous and/or that ammonium nitrate (AN) is not unreasonably dangerous as a matter of law; and that absolute liability for ultrahazardous activity is applicable only to users, not to manufacturers or distributors, of explosives. Plaintiffs [2] in response assert that the criminal act was not independent of Defendant's negligence because it could not have been accomplished unless the perpetrators had access to low density explosive grade AN.[3] Alternatively, even if the AN was fertilizer grade, the intervening criminal act was not independent, Plaintiffs assert, because the injuries and damages would not have occurred had the AN contained additives known to the industry and to Defendant.[4] Alternatively, Plaintiffs assert that the intervening act was not independent because AN should not have been marketed as a fertilizer at all due to its dangers outweighing societal benefits. Plaintiffs additionally assert that they have alleged facts showing that the intervening acts were reasonably

foreseeable or that Defendant should have realized that a situation would be created which would provide a third party an opportunity to commit a crime of which he might avail himself. In any event, Plaintiffs assert, the question of the reasonable foreseeability of an intervening act is a question for the trier of fact, citing *Jackson v. Jones,* 907 P.2d 1067 (Okla.1995). Plaintiffs assert that at a minimum a jury could permissibly find, based upon the facts alleged, that the intervening criminal act was reasonably foreseeable. With respect to their claims for negligence *per se,* Plaintiffs assert that their allegations of a violation of certain statutes also *ipso facto* establish proximate cause.

In reply, Defendant ICI asserts that Plaintiffs' allegation that ammonium nitrate distributed by ICI to a farm cooperative is an explosive, subject to the regulations which Plaintiffs contend ICI violated, is conclusory and contrary to law. Defendant ICI reiterates its arguments that the terrorists' act was the sole and supervening cause of the Plaintiffs' injuries and that Defendant ICI had no duty to anticipate and prevent the

---

**2.** The Plaintiffs in this case include 253 named Plaintiffs, 77 of whom are proposed class representatives, who seek to represent a class composed of the following:

> All citizens, residents and entities of the states and territories of the United States of America who have suffered personal injuries and any and all other damages including, but not limited to, business losses as a result of the bombing of the Murrah Building and surrounding areas and who have sustained or may in the future sustain damages thereby, and all those individuals who may claim loss of consortium from or wrongful death of an individual relative who was injured or killed in the blast.

> Third Amended Class Action Complaint at V, p. 12.

Plaintiffs state that they make no claims in this case for "physical injury to property or costs incidental thereto." *Id.* The named Plaintiffs allege that "each of them, including the proposed class representatives, have sustained psychological injuries as a result of the blast and have experienced extreme mental anguish and grief." *Id.* at VIII, p. 13.

**3.** Plaintiffs allege that explosive grade AN is also referred to as industrial grade AN and is "low density, high porosity ammonium nitrate which absorbs fuel oil (diesel oil) in sufficient amounts capable of detonating the ammonium nitrate with massive destructive power capable of producing the damages and injuries complained of." Third Amended Complaint at XXV, p. 43. Plain-

tiffs allege that explosive grade ammonium is "generally recognized as an explosive (without the addition of fuel oil or diesel oil or any other substance and without any changes, alterations or modifications) in the explosives industry...." *Id.*

**4.** In their Third Amended Complaint, Plaintiffs refer to various patented processes which yield high bulk density ammonium nitrate which is either non-detonable or relatively insensitive to detonation, one of which patented processes Plaintiffs specifically allege provides for the addition of 5–10 percent diammonium phosphate to be blended with AN. *See* Third Amended Complaint at XXXI, pp. 56–61. Plaintiffs allege that Defendant ICI, which was then known as Atlas Chemical Industries, Inc. or Atlas Powder Company, did the testing to support Samuel Porter's 1968 patent for the patented process to make AN non-detonable utilizing the diammonium phosphate additive. *Id.* at p. 58. Additionally, Plaintiffs allege that Defendant ICI Canada, Inc., an alleged sister corporation of Defendant ICI, and Defendant Imperial Chemical Industries, PLC, the alleged parent of Defendant ICI, tested and produced, respectively, a high density, low porosity AN which was not detonable or was insensitive to detonation, which test results and technology those entities should have communicated to Defendant ICI and/or of which Defendant ICI should have been aware. *See id.* at pp. 57 & 59–60.

bombing. In particular, Defendant takes issue with Plaintiffs' allegations and arguments that the alleged acts of McVeigh and Nichols and/or others[5] were not independent and were not adequate of themselves to bring about the injuries in question, asserting that Plaintiffs' bare characterization of ICI's action as an invitation is insufficient to show that the terrorists' acts were not independent. Moreover, Defendant ICI asserts that the mere potential for intentional misuse of a product or object is insufficient, under Oklahoma law, to show that a criminal act is reasonably foreseeable, citing *Henry v. Merck & Co., Inc.*, 877 F.2d 1489, 1491, 1495–96 (10th Cir.1989); *Joyce v. M & M Gas Co.*, 672 P.2d 1172, 1174 (Okla.1983); *Felty v. City of Lawton*, 578 P.2d 757, 760 (Okla. 1977); and *Runyon v. Reid*, 510 P.2d 943, 950 (Okla.1973). Defendant also emphasizes that allegations of a regulatory violation do not render the concept of supervening cause any less relevant or the bombing any more (or less) foreseeable. Defendant contrasts cases like *Lay v. Dworman*, 732 P.2d 455 (Okla.1986); Order, *Larkin v. Withrop Financial Co.*, No. CIV–92–2461 (W.D.Okla. August 31, 1994) and *Henry v. Merck & Co. Inc.*, 877 F.2d 1489, arguing that there was no "special relationship" or special circumstances, like any affirmative act by ICI, which created a recognizable high degree of risk, giving rise to a duty on the part of ICI to anticipate and prevent the bombing of the A.P. Murrah Federal Building. Plaintiffs employ the manufacturers' products liability theory, Defendant ICI asserts, to argue that a duty to manufacture a product that is not unreasonably dangerous extends to and includes a duty to prevent any danger that the product would be put to criminal ends, in contravention of Oklahoma law. Finally, Defendant ICI asserts that there is no causal link between the alleged defect in ICI's ammonium nitrate fertilizer—that it posed a danger of explosion beyond that contemplated by its ordinary consumers, farmers—and the Plaintiffs' injuries because the Plaintiffs were not hurt by an uncontemplated explosion occurring while a farmer was using ICI's ammonium nitrate fertilizer.

In surreply, Plaintiffs explain that they rely on the "traditional balancing approach," i.e., the calculus of risk, to establish ICI's duty, for purposes of common law negligence; that they rely on proof of a reasonable alternative design to raise a genuine issue as to the existence of a design defect and assert that Defendant ICI has ignored the fact that manufacturers' products liability extends to abnormal uses that are reasonably foreseeable. Responding to Defendant's arguments addressed to proximate cause, generally, Plaintiffs stress that eight sets of specific factual allegations[6] in their Third

---

**5.** It is important to note that Plaintiffs specifically allege that ammonium nitrate manufactured by Defendant ICI, sold by it to Farmland Industries, Inc. of Kansas City, Kansas ("Farmland") and by Farmland to Mid–Kansas Cooperative Association ("Mid–Kansas"), was ultimately sold by Mid–Kansas to Timothy McVeigh and Terry Nichols shortly before the bombing of the Murrah Building. *See* Third Amended Complaint at XXV, p. 40 & XXVI ("The Acts of McVeigh and Nichols") 4, p. 46.

Plaintiffs allege that based upon the facts alleged in their Complaint, which facts include specific alleged acts of Timothy McVeigh and/or Terry Nichols, a jury could reasonably determine that Timothy McVeigh and Terry Nichols caused the bombing of the Murrah Building. Third Amended Complaint at XXV, pp. 39 & 40. The Court's references and statements concerning the alleged acts or criminal acts of McVeigh and Nichols herein thus merely describe, mirror or are made to be consistent with the allegations in Plaintiffs' Complaint. Mssrs. McVeigh and Nichols are presumed innocent of all charges in the indictment against them, notwithstanding the requirement that the Court treat all of Plaintiffs'

well-pleaded factual allegations as true for purposes of this motion to dismiss. For purposes of this motion to dismiss, however, whether Timothy McVeigh and Terry Nichols and/or some other person or persons caused the bombing of the Murrah Building is not material—hence the Court's references to the "alleged acts" or "criminal acts of McVeigh and Nichols *and/or others*" herein.

**6.** In their initial brief in support of their response to Defendant ICI's motion to dismiss, Plaintiffs identified "eight sets of factual allegations" included in their Third Amended Complaint which they assert show that a third party's intervening criminal act was foreseeable to Defendant ICI, *see* Brief in Support of Plaintiffs' Response to Defendant's Rule 12(b)(6) Motion to Dismiss at pp. 24–27, which are summarized as follows:

1. Because of the risk of criminal interventions, a custom has developed within the fertilizer industry of only marketing fertilizer-grade AN to the fertilizer market. Third Amended Complaint at p. 54.
2. "Over a span of many years ... ICI was warned on numerous occasions that the

Amended Complaint "show the real foresee-ability of a third-party intervention," thus requiring under *Jackson v. Jones,* 907 P.2d 1067, 1073 (Okla.1995) that an evaluative determination be made by the jury. Surreply Memorandum in Support of Plaintiffs' Response to Defendant's Rule 12(b)(6) Motion to Dismiss at p. 4. Plaintiffs also point to

three 1996 decisions of the Oklahoma Supreme Court which they contend emphasize the "factual nature of the proximate cause issue and the broad discretion assigned to the jury," in deciding the issue in Oklahoma: *Delbrel v. Doenges Brothers Ford, Inc.,* 913 P.2d 1318 (Okla.1996); *Byus v. Mid–Century Insurance Co.,* 912 P.2d 845 (Okla.1996);

availability of large amounts of AN fertilizer was certain to result in criminals intentionally driving a large load of AN fertilizer into a town and detonating it." Third Amended Complaint at p. 63.

3. "[D]efendants should have known that for decades before the bombing ... law enforcement officials had been advising the [fertilizer] industry ... that such AN fertilizer was so highly dangerous that it should not be manufactured without an additive which would reduce or eliminate its potential explosive nature and that it was the substance of choice of those building car and truck bombs." Third Amended Complaint at p. 66.

4. There is a substantial record over the years of the use or attempted use of AN as an explosive by criminals, which Defendant ICI knew of or could and should have known of, including the bombing of Sterling Hall at the University of Wisconsin using an AN fertilizer bomb in 1970, *see* Third Amended Complaint at p. 68; "numerous criminal uses or criminal attempts to use AN as an explosive or bomb in the United States during the two decades prior to" 1995, *id.* at p. 66; and a plan by persons who were members of the same cell as those responsible for the World Trade Center bombing, which was interdicted by the FBI in 1993, to bomb a number of New York City landmarks including the U.N. headquarters, the federal building which houses the New York FBI office and the Lincoln and Holland tunnels with AN bombs. *Id.* at p. 67. These events were well publicized or Defendant ICI was aware of them, *id.* at pp. 66, 67 & 69 and, in the case of the plot to bomb the New York buildings, Defendant ICI must have been aware of it because it participated in the investigation of the World Trade Center bombing.

5. By 1969, Defendant ICI's parent company was producing and selling in the United Kingdom a high density form of AN and the parent company appreciated that an important quality of that produce was that it was maximally insensitive to detonation. *See* Third Amended Complaint at p. 59.

6. At a symposium in 1970 at which designated attendees of Defendant ICI served as chairman and moderator, a speaker specifically called attention to the risk of intentional detonation of AN fertilizer. *See*

Third Amended Complaint at pp. 63–64. In the min–1970's, an officer of a trade association warned Defendant ICI and others that "there was a severe and present danger of the criminal use of low density ammonium nitrate ... which could result in massive destruction and the loss of lives if the industry did not take further steps to limit the sales of low density AN to those which held permits to use explosives." *Id.* at pp. 65–66.

7. Inventors have secured various patents for processes utilizing additives or otherwise to make ammonium nitrate in a high density form which will not absorb sufficient fuel oil to be used in ANFO, i.e., for explosive purposes, *see* Third Amended Complaint at pp. 57–58, indicative that the inventors appreciated the explosive risks of AN. Defendant ICI Canada, a sister corporation of Defendant ICI, which Plaintiffs allege exercises dominion and control over Defendant ICI jointly with the parent corporation of both, did research and testing to support a patent issued April 30, 1992 on a high density, low porosity AN and found it would not absorb sufficient fuel oil to detonate Third Amended Complaint at p. 57. Defendant ICI, then known as Atlas Chemical Industries, Inc. or Atlas Powder Company, did the testing to support a patent issued to Samuel Porter in 1968 for a process to make ammonium nitrate non-detonable. *Id.* at p. 58. "ICI was made aware that the Samuel Porter patent was being made available to manufacturers of AN fertilizer such as ICI for, among other purposes, to deter criminal use of fertilizer AN in bombs...." *Id.*

8. There has been legislative action in various countries of the world to require the use of additives similar to that used in the Porter patent in AN and/or the reduction in the nitrate content of AN. *See* Third Amended Complaint at pp. 70–71. At least some of this legislation was prompted by bombings using AN. *Id.* Defendant ICI and/or "the ICI group," i.e., a group of companies wholly or partly owned by Defendant Imperial Chemical Industries, Inc., sells AN in the world market, is required to and does comply with such legislation and is aware of worldwide practices relating to AN manufacture and content. *See id.* at 71.

*Dirickson v. Mings,* 910 P.2d 1015 (Okla. 1996). With respect to the issue of duty, Plaintiffs assert that "since the standards for supervening cause and duty are closely related, it can be assumed that Oklahoma law assigns to the jury on the issue of duty about the same broad role the jury enjoys over the issue of supervening cause." Surreply Memorandum at p. 8.

Responding to Defendant's Reply Brief arguments directed to Plaintiffs' negligence *per se* claims, Plaintiffs assert that they have alleged that Defendant's ammonium nitrate was "explosive grade" and have established by reference to U.N. test results that explosive grade ammonium nitrate is a Class I explosive. The fact that ammonium nitrate is not included in the BATF Annual Lists of Explosive Materials or does not fall within the definition of an explosive in 18 U.S.C. § 841 is not determinative of whether it is an explosive under NFPA 495 and under the HazMat Regulations or the U.N. Recommendations and its Tests and Criteria Manual, Plaintiffs maintain. And the very fact that NFPA 495 adopted the definitions and classifications of explosives contained in the HazMat Regulations and the U.N. Recommendations in addition to the definitions in 18 U.S.C. § 841 indicates that the National Fire Protection Association considered that the BATF list and the Section 841 definitions were not wholly adequate. Plaintiffs assert that violations of a regulation designed to protect a particular class of persons *ipso facto* furnishes proximate cause without further proof of foreseeability.

In determining whether Defendant's ammonium nitrate is an explosive under NFPA 495, HazMat Regulations and U.N. Recommendations, Plaintiffs assert that their expert's affidavit should be considered. Finally, they argue that 18 U.S.C. § 841 *et seq.* should be read to include explosive grade ammonium nitrate because it may reasonably be inferred or necessarily follows that the primary or common purpose of explosive grade ammonium nitrate is to function by explosion.

## I. *CAUSATION*

■ Defendant ICI argues that Plaintiffs have failed to state a claim on which relief can be granted because they have failed to allege facts showing that any action or inaction of Defendant ICI was the proximate cause of Plaintiffs' injuries or that Plaintiffs' complaint shows that the alleged criminal acts of McVeigh and Nichols or others were the supervening cause of Plaintiffs' injuries.

■ Under Oklahoma law, proximate cause is an essential element of a claim for relief based on negligence, *see, e.g., Jackson v. Jones,* 907 P.2d 1067, 1072 (Okla.1995); *Thompson v. Presbyterian Hospital, Inc.,* 652 P.2d 260, 263 (Okla.1982); negligence *per se, see, e.g., Tomlinson v. Love's Country Stores, Inc.,* 854 P.2d 910, 915 (Okla.1993); *Brigance v. Velvet Dove Restaurant, Inc.,* 725 P.2d 300, 305 (Okla.1986); *Felty v. City of Lawton,* 578 P.2d 757, 760 (Okla.1977); and manufacturers' products liability, *see Blair v. Eagle–Picher Industries, Inc.,* 962 F.2d 1492, 1495–96 (10th Cir.1992), *cert. denied,* 506 U.S. 974, 113 S.Ct. 464, 121 L.Ed.2d 372 (1992); *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1363 (Okla. 1974). The proximate cause of an event or injury must be that which in a natural and continuous sequence, unbroken by an independent or supervening cause, produces the event or injury and without which the event or injury would not have occurred. *E.g., Gaines v. Providence Apartments,* 750 P.2d 125, 126–27 (Okla.1987). An independent cause which will break the causal nexus between a defendant's negligence or a defective product and the injury is called the supervening cause. *See Messler v. Simmons Gun Specialties, Inc.,* 687 P.2d 121, 125 (Okla. 1984) (manufacturer's products liability); *Thompson v. Presbyterian Hospital, Inc.,* 652 P.2d 260, 264 (Okla.1982) (negligence). A cause is a supervening cause which will operate to insulate the original actor or manufacturer from liability only if it meets a three-pronged test. *Thompson v. Presbyterian Hospital, Inc.,* 652 P.2d at 264. It must be 1) independent of the original act; 2) adequate of itself to bring about the result; and 3) one the occurrence of which was not reasonably foreseeable. *Id. Accord Byus v. Mid–Century Insurance Co.,* 912 P.2d 845, 847 (Okla.1996); *Jackson v. Jones,* 907 P.2d 1067, 1073 (Okla.1995); *Graham v. Keuchel,* 847 P.2d 342, 348 (Okla.1993); *Henry v. Merck and Co., Inc.,* 877 F.2d 1489, 1495

(10th Cir.1989). The fact that an injury would not have occurred except for or but for the original act does not negate the existence of an intervening cause or render the original act the proximate cause of an event or injury, notwithstanding the existence of a supervening cause. *See Henry v. Merck and Co., Inc.,* 877 F.2d at 1494 (quoting *Beesley v. United States,* 364 F.2d 194, 196 (10th Cir. 1966)).

The Tenth Circuit in *Henry v. Merck and Co., Inc.,* explained the requirement that a supervening cause be independent of the original act as follows:

> An act is independent when it is not logically compelled by and does not naturally flow from, the original carelessness. Independence does not necessarily imply absence of some linkage between the two acts; rather, it means that the intervening act is neither invited by nor an ordinary response to the original act. When the intervening act is intentionally tortious or criminal, it is more likely to be considered independent. *Cf Restatement (Second) of Torts* § 302B, comment d(1965).
>
> *Henry v. Merck and Co., Inc.,* 877 F.2d at 1495.

With respect to the issue of adequacy of a supervening cause, the fact that the original actor's conduct or product may have facilitated an intervening actor's actions does not prevent the intervening cause from meeting the requirement that it be adequate of itself to bring about the result. *See id.* at 1496.

The question of proximate cause is generally one of fact for the jury; it becomes one of law only when there are no facts or evidence from which a jury could reasonably find the required causal nexus between the act and the injury. *Jackson v. Jones,* 907 P.2d at 1073. Whether there are any facts or evidence that would support a jury finding of proximate cause is a question of law for the court. *Id.* The Oklahoma Supreme Court has recently explained the factual nature of the issue of an intervening act or event's foreseeability:

> The question of an intervening event's *foreseeability* calls for an evaluative determination by the trier of fact. Whether the injurious consequences that resulted from the original negligence could have been reasonably foreseen is an issue traditionally within the realm of fact, not law. If the intervening force is of a character which (under the circumstances) would induce belief that it might be *reasonably expected* to occur, the final element is *not* met and the causal chain will remain *unbroken.*
>
> Disputed, relevant facts call for the jury's evaluative determination on this issue.
>
> *Jackson v. Jones,* 907 P.2d at 1073 (footnotes omitted).

It is clear from the court's opinion in *Jackson v. Jones,* however, that where there are no material facts in dispute and the undisputed facts do not support conflicting inferences, proximate cause or the existence of a supervening cause which breaks the causal link may be decided as a matter of law. *See Jackson v. Jones,* 907 P.2d at 1075. *Accord Dirickson v. Mings,* 910 P.2d 1015, 1019 (Okla.1996). The Oklahoma Supreme Court has previously recognized that some events or occurrences may be "so unusual and extraordinary ... as to merit recognition as unforeseeable in law." *Minor v. Zidell Trust,* 618 P.2d 392, 394 (Okla.1980).

Presuming all well-pleaded factual allegations in Plaintiffs' Third Amended Complaint to be true and construing those facts in a light most favorable to the Plaintiffs, *see e.g., Seamons v. Snow,* 84 F.3d 1226, 1232 (10th Cir.1996); *Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262, 1266 (10th Cir.1989), Plaintiffs have failed to state a claim on which relief can be granted, F.R.Civ.P. 12(b)(6), and Plaintiffs' own allegations indicate beyond any doubt that they can prove no set of facts which would entitle them to relief. *See, e.g., Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957); *National Commodity and Barter Association v. Archer,* 31 F.3d 1521, 1527 (10th Cir.1994). This is so because Plaintiffs' own allegations show that neither Defendant's negligence, assuming the existence thereof, nor their product, was the proximate cause of the Plaintiffs' injuries and that the alleged acts of McVeigh and Nichols and/or other persons in intentionally bombing the Murrah Building were the supervening cause of Plaintiffs' injuries. The nature and character of the intervening acts alleged by Plaintiffs are such that rea-

sonable jurors could not fail to find that those acts were the supervening cause of Plaintiffs' injuries. Plaintiffs have alleged and can allege no facts which would support a conflicting inference or finding.

Plaintiffs point to and the Court has culled from Plaintiffs' Complaint the following allegations which are relevant to the issue of whether the intervening criminal act(s) of those who bombed the Murrah Building were independent of Defendant's production and marketing of what Plaintiffs allege was a low density, high porosity form of ammonium nitrate, or explosive grade or industrial-grade ammonium nitrate:

ICI knew by reason of such symposium [sponsored by a fertilizer trade association in the early 1970s] that explosive grade AN produced and marketed as fertilizer was a dangerous instrumentality which would tempt a recognized percentage of humanity and/or a peculiarly vicious type of humanity to commit a fairly definite type of crime such as the bombing of the Murrah Building.

Third Amended Complaint at XXXIII, p. 65.

There is evidence that both McVeigh and Nichols had tested the explosive qualities of AN before the bombing of the Murrah Building. Such tests could be as simple as measuring the weight of the AN before adding fuel oil (diesel fuel) and then weighing the AN after the addition to determine the amount by weight of fuel or oil absorbed or mixing a small amount with fuel oil and detonating it. If the subject AN had been fertilizer grade, any tests made by McVeigh and/or Nichols would have revealed it was not suitable for the Murrah Building bombing, but since it was explosive grade such tests would confirm it was an ideal explosive. Therefore the marketing of the subject AN invited the misconduct of the perpetrations [sic] of the bombing of the Murrah Building.

While McVeigh and Nichols were capable of making such weight measurements they were not sophisticated in the formulation and use of explosives. The availability of AN which contained no additives and which was explosive grade was an invitation to persons not sophisticated such as McVeigh and Nichols by ICI to formulate

and carry out any plans they might have to bomb the Murrah Building.

*Id.* at XXXIX, p. 76.

In connection with the former allegation, Plaintiffs allege that two ICI designated attendees of the symposium who were employees of ICI and/or the ICI group, one of whom was the chair and the other a moderator of the symposium, were told that there are a great many intentional detonations in the UK and were asked, at least rhetorically, to what extent maliciously minded people could make some big explosions using ordinary ammonium nitrate fertilizers. Third Amended Complaint at XXXIII, pp. 63–64. The speaker is alleged to have also said that his only point was that ammonium nitrate, which doesn't have to be made, is there in large quantities and "[y]ou could have a 20-ton lorry load and drive it into a town, whereas you would have to prepare the other mixtures deliberately." *Id.* at p. 64. In connection with the latter above-quoted allegations, Plaintiffs further allege that "[t]here is no other commercially and unrestricted substance available (in sufficient amounts without creating suspicion) that could have provided the blast force of AN" which would be economically and technologically feasible for use by criminals to bomb a building, especially those who lack sophisticated education or training, and a large amount of money, like McVeigh and Nichols. *Id.* at XXXIX, p. 77.

Notwithstanding Plaintiffs' conclusory allegations to the contrary, the availability of Defendant's ammonium nitrate, whether low-density explosive grade or high-density in form, may have made it easier for whoever bombed the Murrah Building to carry out their intent or plan to do so, but Defendant's production, marketing or sale of ammonium nitrate in whatever form did not logically compel or induce the bombing, and certainly conception of a plan to bomb a building or the bombing itself is not an ordinary response to and does not logically flow from the availability of ammonium nitrate in whatever form in the fertilizer market. *Compare with Henry v. Merck and Co., Inc.,* 877 F.2d at 1489. It defies all logic and common sense to suggest that the very existence or availability of a substance which can be used as or

employed in a weapon invites persons to use it as or in a weapon, particularly where, as here, it is mislabeled [7] as something which Plaintiffs allege could not be used as or in a bomb or, at a minimum, would not provide much blast force.[8] As Defendant aptly puts it, "[t]he bombing did not occur because Nichols and McVeigh acquired AN fertilizer. The bombing occurred only because of the terrorists' intent to cause harm ..." Supplemental Memorandum in Support of Defendants' Motion at p. 8. The intervening acts of McVeigh and Nichols and/or others alleged by Plaintiffs, which acts were both tortious and criminal, were independent as a matter of law.

Likewise, the intervening acts alleged by Plaintiffs were adequate of themselves to bring about Plaintiffs' injuries as a matter of law. The availability of ammonium nitrate in a detonable form may have made the criminal acts possible or facilitated them, *see Henry v. Merck and Co., Inc.,* 877 F.2d at 1495; *see also Graham v. Keuchel,* 847 P.2d at 349, but it was the criminal actions of McVeigh and Nichols and/or others which directly caused the Plaintiffs' injuries as a matter of law.

Plaintiffs have made numerous allegations from which it can reasonably be inferred that the possibility that criminals or terrorists might employ AN to make an explosive or bomb and attempt-to detonate it somewhere in the United States was foreseeable to Defendant.[9] But the Court agrees with Defendant ICI that this is not the level of foreseeability which would permit a finding that the acts of the person or persons who bombed the Murrah Building were reasonably foreseeable to Defendant and as would preclude a conclusion that their acts were the supervening cause of Plaintiffs' injuries as a matter of law. Plaintiffs have acknowledged that "[t]he average consumer of AN branded as a fertilizer would be a farmer," Third Amended Complaint, XXXVI, at p. 73, and Plaintiffs have alleged that while the AN manufactured and sold by Defendants and used in the bomb which destroyed the Murrah Building was low density, explosive grade AN, *see id.* at XXV, pp. 39–40 and 43–44, they have

alleged that such AN was "misbranded as fertilizer" *id.* at XXV, p. 40, and was purchased by McVeigh or Nichols, using an alias, at Mid–Kansas Cooperative Association in McPherson, Kansas. *See id.* at pp. 39–40 & XXVI, pp. 45–46. Plaintiffs have further alleged that fertilizer grade AN cannot absorb fuel oil in an amount sufficient to detonate the AN or if detonated, to provide a rate of detonation sufficient to cause the damages and injuries of which Plaintiffs' complain, i.e., "[f]ertilizer grade AN would not have been capable of being used by McVeigh and Nichols to have built a bomb which would have caused the injuries, death and damages complained of" in Plaintiffs' complaint. Third Amended Complaint at XXVI, p. 43. The facts alleged—that the typical consumer of explosive grade AN mislabeled as fertilizer is a farmer; that such AN was sold through a co-op in McPherson, Kansas; and that fertilizer grade AN is either not capable of detonation or is insufficiently so to cause the damages and injuries complained of—prevent any inference that such material would typically be used as an ingredient in a weapon or purchased by terrorists or criminals for that purpose. *Compare with Henry v. Merck and Co., Inc.,* 877 F.2d at 1495 (no evidence which could support a finding that employer could reasonably foresee that its employee would steal sulfuric acid and use it as a weapon where evidence was that the employee "was a model employee who never gave any indication of criminal propensities, and there was no showing that acid was the sort of material that would typically be subject to theft or used as a weapon."). The acts herein are, under the facts and circumstances alleged, even less foreseeable than the acts in *Henry v. Merck and Co., Inc.,* 877 F.2d 1489; in *Joyce v. M & M Gas Co.,* 672 P.2d 1172 (Okla.1983); and in *Minor v. Zidell Trust,* 618 P.2d 392 (Okla.1980). In the Court's view, consistent with controlling precedent, if ever there were "an event so unusual and extraordinary ... as to merit recognition as unforeseeable in law," *Minor v. Zidell Trust,* 618 P.2d at 394, the criminal act

---

7. *See* Third Amended Complaint at XXV, p. 40.

8. *See* Third Amended Complaint at XXV, p. 43.

9. *See* note 6, *supra.*

of bombing the Murrah Building, which directly caused the Plaintiffs' injuries, is it.

## II. *DUTY*

■ Defendant ICI asserts that it had no duty to the Plaintiffs to anticipate or prevent the terrorist attack. To establish a duty on the part of Defendant owed to the Plaintiffs, Plaintiffs rely on their allegations and a calculus of risk or the balancing approach embodied in the *Restatement (Second) of Torts* §§ 291–93 (1965); the asserted existence of a special relationship or responsibility or special circumstances giving rise to a duty to anticipate and prevent the acts of a third party; and various state and federal laws and regulations. Indeed, Plaintiffs rely on the existence of a special responsibility of Defendant ICI, the existence of special circumstances and negligence *per se* not only to establish duty but to establish causation as well, citing, e.g., *Rubin v. Johnson,* 550 N.E.2d 324 (Ind.App.1990); *Scheibel v. Hillis,* 531 S.W.2d 285 (Mo.1976); and *Restatement (Second) of Torts* § 449.

■ An essential element of a negligence cause of action is the existence of a duty owed by the defendant to the plaintiff. *See MBA Commercial Construction, Inc. v. Roy J. Hannaford Co., Inc.,* 818 P.2d 469 (Okla.1991). *See also Grover v. Superior Welding, Inc.,* 893 P.2d 500, 502 (Okla.1995); *Busby v. Quail Creek Golf and Country Club,* 885 P.2d 1326, 1329 (Okla.1994); *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1184 (10th Cir.1995). Indeed, whether the defendant owed a duty to the plaintiff allegedly harmed is the threshold question in any negligence action. *Grover v. Superior Welding, Inc.,* 893 P.2d at 502; *Wofford v. Eastern State Hospital,* 795 P.2d 516, 518 (Okla.1990); *Rohrbaugh v. Celotex Corp.,* 53 F.3d at 1184. "The most important consideration in this determination is whether the plaintiff is foreseeably endangered by the defendant's conduct." *Rohrbaugh v. Celotex Corp.,* 53 F.3d at 1184, citing *Wofford v. Eastern State Hospital,* 795 P.2d at 519. Merely because a defendant has created a risk which harmed the plaintiff does not mean that the defendant will be liable to the plaintiff; the defendant must have owed a duty to the plaintiff for liability to attach. *See Nicholson v. Tacker,* 512 P.2d 156, 158 (Okla.1973); *Henry*

*v. Merck and Co., Inc.,* 877 F.2d at 1492. Whether a duty exists—that is, whether the defendant stands in such a relationship to a plaintiff that the law will impose upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff—is a question of law for the Court. *Wofford v. Eastern State Hospital,* 795 P.2d at 519; *Henry v. Merck and Co., Inc.,* 877 F.2d at 1492.

The risk-benefit analysis or calculus of risk, which is incorporated in Sections 291–293 of the *Restatement (Second) of Torts,* was first employed by the Second Circuit in *United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (2nd Cir.1947). It has been employed primarily to determine whether a party was negligent, i.e., breached a duty of care owed to the plaintiff, rather than to determine whether the defendant owed a duty of care to the plaintiff. *See Shute v. Moon Lake Electric Association, Inc.,* 899 F.2d 999, 1003 n. 3 (10th Cir.1990). In *Smith v. Johnston,* 591 P.2d 1260, 1262–63 (Okla. 1978), which Plaintiffs cite as evidence that the Oklahoma Supreme Court has "essentially accepted" the calculus of risk approach, *see* Surreply Memorandum at p. 2, the Oklahoma Supreme Court employed this approach to determine whether there was a violation of a duty. 591 P.2d at 1263. The Court has found no Oklahoma Supreme Court case adopting or employing the calculus of risk analysis to determine whether the defendant owed a duty of care to the plaintiff. Thus, Plaintiffs' allegations and arguments directed to or predicated upon a calculus of risk are of no avail to Plaintiffs in their attempt to show that Defendant ICI owed a duty to them.

■ The general rule in Oklahoma as elsewhere is that absent special circumstances a party has no duty to anticipate and prevent the intentional or criminal acts of a third party. *Joyce v. M & M Gas Co.,* 672 P.2d 1172, 1173 (Okla.1983); *Henry v. Merck and Co., Inc.,* 877 F.2d at 1492. "Oklahoma recognizes only two types of special circumstances that create a duty to anticipate and prevent the acts of a third party," *Henry,* 877 F.2d at 1492, both of which types of circumstances have been alleged, Plaintiffs appear

to assert. The first circumstance in which a duty to anticipate and prevent the acts of a third party exists or may exist is where the actor is under a special responsibility toward the one who suffers the harm. *Joyce*, 672 P.2d at 1174; *Henry*, 877 F.2d at 1492. A special responsibility may arise from a pre-existing relationship with the victim coupled with the foreseeability of the specific risk to the victim, *Henry*, 877 F.2d at 1492–93, illustrated by the cases of *Lay v. Dworman*, 732 P.2d 455 (Okla.1986) and Order, *Larkin v. Winthrop Financial Co., Inc.*, No. CIV–92–2461–R (W.D.Okla. Aug. 31, 1994), involving a landlord and tenant, and commercial lessor and its tenant's employee and business invitee, respectively. Other types of relationships which may give rise to one person's special responsibility to protect the other from third persons' intentional or criminal acts include those of a carrier and passenger, innkeeper and guest and employer and employee. *See Restatement (Second) of Torts* § 302B, Comment e(B). No such special pre-existing relationship between Defendant ICI and Plaintiffs is alleged or asserted. Plaintiffs have, however, asserted that they have alleged a special relationship between Defendants and Plaintiffs which was created by the National Fire Protection Association Pamphlet No. 495, Explosive Materials Code ("NFPA 495") adopted by law. Brief in Support of Plaintiffs' Response to Defendant's Rule 12(b)(6) Motion to Dismiss at p. 32. The Court will address that argument in connection with its consideration of Plaintiffs' allegations and arguments that various statutes and regulations impose a duty upon Defendants which they breached, constituting negligence *per se*.

The second type of special circumstance creating a duty to anticipate and prevent a third party's actions recognized in Oklahoma is where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through the misconduct of third persons which a reason-able person would have taken into account. *Joyce*, 672 P.2d at 1174; *Henry*, 877 F.2d at 1492–93. *See Felty v. City of Lawton*, 578 P.2d 757 (Okla.1977); *Restatement (Second) of Torts* § 302B & Comment d. Plaintiffs have alleged an affirmative act by Defendants—that they sold and distributed in the fertilizer market low density explosive grade AN rather than fertilizer grade AN and without incorporating an additive which would prevent detonation. They have further alleged that "ICI and the other defendants were well aware of the recognized high degree of risk associated with the marketing of AN and the likelihood that if extreme care was not taken such AN was likely or certain to fall into the hands of persons such as the perpetrators of the Murrah Building [sic] and used for bombings such as the bombing of the Murrah Building." Third Amended Complaint at XXXI, p. 59. *See also id.* at p. 60. Plaintiffs have also made numerous allegations designed to show the foreseeability to Defendants that terrorists or criminals might purchase the AN marketed by Defendants and use it to construct a bomb to bomb a building such as the Murrah Building [10] and hence to show that Defendants realized or should have realized that their marketing and sale of explosive grade AN without an additive involved an unreasonable risk of harm to the public at large and to employees in federal buildings in particular [11] through the conduct of third persons which was intended to cause harm, which a reasonable person would have taken into account. What the Court has said above concerning the foreseeability of third persons' intervening criminal acts is perforce applicable here, particularly since, it is alleged, Defendant ICI's product was mislabeled or branded as fertilizer and was sold in a co-op in McPherson, Kansas. Because the AN was branded as fertilizer and was sold through a farmers co-op in McPherson, Kansas, Defendant had much less reason to anticipate that persons

---

**10.** *See* note 6, *supra*.

**11.** Plaintiffs allege that one of the purposes of the regulations cited by Plaintiffs and of NFPA 495 in particular is to prevent explosives "from falling into the hands of criminals who advocate violent action against a federal or governmental agency such as was the case in the Murrah Building bombing," quoting NFPA 495, 2–7.1 ("A permit for the possession and use of explosive materials may be denied or revoked for any of the following reasons: ... (f) Proof that the permit applicant or holder advocates ... violent action against any federal, state or local government."). Third Amended Complaint at XXVIII, p. 50. *See also id.* at XXVII, p. 49.

purchasing its product would use it to construct a bomb and to commit what may be the worst mass murder in the peacetime history of the United States than it would have had had they sold the AN labeled as explosive grade AN in the New York City or Washington, D.C. area, for example. Plaintiffs have not alleged and could not allege that Defendant ICI had any reason to know of the criminal propensities of customers of Mid–Kansas Cooperative Association, of the alleged perpetrators or of their intention to use Defendant ICI's product in a weapon of mass destruction, much less specifically against the Murrah Building and its occupants in Oklahoma City. *Compare with Henry v. Merck and Co., Inc.,* 877 F.2d at 1493–94.

Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence. In the ordinary case he may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone. This is true particularly where the intentional conduct is a crime, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law. *Even where there is a recognizable possibility of the intentional interference, the possibility may be so slight, or there may be so slight a risk of foreseeable harm to another as a result of the interference, that a reasonable man in the position of the actor would disregard it.*

> *Restatement (Second) of Torts* § 302B, Comment d (emphasis added).

Accepting as true all of Plaintiffs' allegations concerning Defendants' knowledge of terrorists' use of AN in bombs and bombing plots, but also considering as true Plaintiffs' allegations that the AN was branded as a fertilizer and sold through a farmers' cooperative in McPherson, Kansas, the recognizable *possibility* of risk of harm from Defendant ICI's distribution and sale of explosive grade AN through the intentional or criminal acts of third parties was so slight that reasonable persons in Defendant ICI's position would disregard it. Therefore, Defendant had no duty to anticipate and guard against the intentional and criminal misconduct of others and specifically that of the person or persons whose acts caused the injuries of which Plaintiffs complain. Even if the existence of a duty arising from defendants' own acts creating a recognizable high degree of risk may, in some circumstances, present a question of fact for the jury, it does not do so here. Accepting Plaintiffs' allegations as true and entertaining all reasonable inferences therefrom in Plaintiffs' favor, reasonable jurors could not find that Defendant ICI's conduct created a recognizable high degree of risk to others through intentional and/or criminal intervention of third persons that reasonable persons in its position would guard against.

## III. *NEGLIGENCE PER SE*

■ Defendant ICI asserts that it is entitled to dismissal of Plaintiffs' negligence *per se* claims on the grounds that its distribution of AN to a farm cooperative did not violate any explosives regulation and that the lack of proximate cause defeats any claim of negligence *per se.*

Plaintiffs have alleged that Defendant ICI's sale of allegedly explosive grade AN to Farmland, which Plaintiffs allege did not possess a permit to purchase the AN, as required by Kansas law and federal law, and Defendant ICI's distribution and transportation of the AN to Mid–Kansas Cooperative Association, which Plaintiffs allege did not possess a permit to purchase or possess the subject AN as required by both Kansas and federal law, was a violation of the law of the State of Kansas and of 18 U.S.C. § 841 *et seq.* by Defendant ICI. Third Amended Complaint at XXVIII, p. 49. Plaintiffs further allege that Defendant ICI had a legal duty to insure that Farmland and Mid–Kansas had permits required by Kansas and federal law before selling, distributing and transporting or causing the transportation of the subject AN to the Kansas entities. *Id.* Plaintiffs then cite to various state and federal statutes and regulations, codes and standards adopted thereby a) which they allege created a special

relationship "between Defendant ICI, the public and persons who might be injured or killed or damaged by reason of explosives manufactured by ICI which are used to commit violent acts against a governmental agency such as the agencies housed in the Murrah Building" which required ICI "not to dispose of explosives outside of the explosives market . . . which might cause them to fall into the hands of criminals," *Id.* at p. 51; and b) the violation of which they allege constituted negligence *per se.*

 If there are criminal or regulatory statutes which limit or circumscribe defendants' conduct, a court may adopt the standard prescribed by the statutes as that which would be expected of reasonably prudent persons, provided the court finds that the statutorily required conduct is appropriate for establishing civil liability. *Busby v. Quail Creek Golf & Country Club,* 885 P.2d at 1329; *Mansfield v. Circle K Corp.,* 877 P.2d at 1132. When a court adopts the statutory standard for a negligence cause of action, the violation of the statute is said to be negligence *per se. Id.* To establish negligence *per se* on the basis of a statutory violation, a plaintiff must establish that 1) the injury was caused by the violation; 2) the injury was a type intended to be prevented by the statute; and 3) the injured party was a member of the class which the statute was intended to protect. *Id.*

Sections 842(e) and (f) of Title 18 of the United States Code, which Plaintiffs allege Defendants violated, Third Amended Complaint at XXVIII, p. 51, provide as follows:

e) It shall be unlawful for any licensee knowingly to distribute any explosive material, to any person in any state where the purchase, possession, or use of such explosive materials would be in violation of any state law or any published ordinance applicable at the place of distribution.

18 U.S.C. § 842(e).

f) It shall be unlawful for any licensee or permittee willfully to manufacture, import, purchase, distribute, or receive explosive materials without making such records as the Secretary may be regulation require,

including, but not limited to, a statement of the intended use, the name, date, place of birth, social security number, and place of residence of any natural person to whom explosives are distributed.

18 U.S.C. § 842(f).

"Explosive materials" is defined to mean "explosives, blasting agents, and detonators." 18 U.S.C. § 841(c). "Explosives" is defined, except for purposes of subsections (d) through (j) of Section 844, to mean "any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion. . . ." 18 U.S.C. § 841(d). Section 841(d) states that the term "explosives" includes a number of items specified therein and further provides that "[t]he Secretary shall publish and revise at least annually in the Federal Register a list of these and any additional explosives which he determines to be within the coverage of this chapter." *Id.*

Section 31–133 of the Kansas Statutes Annotated provides as follows:

**31–133.** Fire safety and prevention; rules and regulations for safeguarding life and property from fire and explosion; mandatory requirements; incorporation by reference of certain codes; continuation in service of certain facilities. (a) The state fire marshal shall adopt reasonable rules and regulations, consistent with the provisions of this act, for the safeguarding of life and property from the hazards of fire and explosion. Such rules and regulations shall include, but not be limited to the following:

(1) The keeping, storage, use, sale, handling, transportation or other disposition of highly flammable materials, including crude petroleum or any of its products, natural gas for use in motor vehicles, and of explosives, including gunpowder, dynamite, fireworks and firecrackers; and any such rules and regulations may prescribe the materials and construction of receptacles and buildings to be used for any of such purposes;

Section 21–4207 of the Kansas Statutes Annotated provides as follows:

21–4207. Failure to register sale of explosives. (1) Failure to register sale of explosives is the omission, by the seller of any explosive or detonative substance, to keep a register of every sale or other disposition of such explosives made by him as required by this section.

(2) The register of sales required by this section shall contain the date of the sale or other disposition, the name, address, age and occupation of the person to whom the explosive is sold or delivered, the kind and amount of explosive delivered, the place at which it is to be used and for what purpose it is to be used. Said register and said record of sale or other disposition shall be open for inspection by any law enforcement officer, mine inspector or fire marshal of this state for a period of not less than one (1) year after said sale or other disposition.

(3) Failure to register sale of explosives is a class B misdemeanor.

Plaintiffs allege that Defendant ICI failed to register the sale of the subject AN in violation of KS–21–4207. Plaintiffs also allege that Defendant ICI violated federal and Kansas law by selling, distributing and transporting an explosive to Farmland and Mid–Kansas which did not possess permits to purchase or possess it.

In order to show that Defendant ICI violated either Section 842(e) or Section 842(f) of Title 18 of the United States Code, Plaintiffs must show that the alleged low density explosive grade ammonium nitrate is an "explosive" within the meaning of those federal statutes and, to show a violation of Section 842(e), Plaintiffs must also show that the alleged low density explosive grade ammonium nitrate is an "explosive" within the meaning of the state law which was allegedly violated by the distribution to a person in that state, here the alleged Kansas statutes.[12]

An examination of the legislative history of Title XI of the Organized Crime Control Act

of 1970, 18 U.S.C. § 841 *et seq.* reveals that Congress did not intend to include ammonium nitrate within the definition of explosive and did not intend to regulate the sale or distribution of ammonium nitrate in its separate state, the state in which Plaintiffs allege herein it was sold:

> Mr. Zelenko. As I understand it, the mixture of fuel oil and ammonium nitrate, is used widely in mining operations and by farmers. It is a simple and cheap explosive material.

> The Chairman. It is used for blasting tree stumps and these sorts of things?

> Mr. Dole. That is correct.

> Mr. Zelenko. Would a person be a manufacturer or a dealer if he mixed these materials? How would he be dealt with in the proposed statute? Suppose he brought these two materials separately? How does the bill deal with the actual mixture? Ammonium nitrate is shipped by itself, and fuel oil is available by itself. How does the bill deal with the final mixture when the two are made into a package or compound?

> Mr. Dole. If I may refer this to Mr. Bracken.

> Mr. Bracken. *I understand the distinction between our definition, in talking about the ammonium nitrate situation, ammonium nitrate is not within the definition of a blasting agent,* which would mean it would not come under an explosive material which is covered by this bill. This bill would not cover the shipment of the ammonium nitrate as an individual and isolated substance. Therefore the farmer, I assume, could acquire the fuel oil and put the two together and blow the stump.

> Mr. Zelenko. He would not need a user permit?

> Mr. Bracken. No.

> The Chairman. In other words, he would not need a user's permit under those circumstances. Is that correct?

---

12. Plaintiffs have not alleged but must also show that Defendant ICI was a "licensee" within the meaning of 18 U.S.C. § 841(m) to establish a violation of 18 U.S.C. § 842(e) and that it was either a "licensee" or a "permittee" as defined in 18 U.S.C. § 841(j) to establish a violation of 18 U.S.C. § 842(f).

Mr. Bracken. That is correct. I would like to point up one other perhaps misconception. Our bill does not require a user permit even for the acquisition of explosive material if the user is acquiring the material in his own State or in a contiguous State. The user permit system we provide for in our bill is in connection with the acquisition of explosives beyond the contiguous State. In other words, your bill and our bill on the acquisition within the State and contiguous State are the same.

The Chairman. The user permits covers shippers in interstate commerce only?

Mr. Bracken. Beyond the contiguous State.

> Hearings on H.R. 17154, H.R. 16699 and H.R. 18573 before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 91st Cong., 2d Sess., at 134–135 (emphasis added). (Supplemental Appendix of Authorities in Support of Reply Brief at Tab 11).

*See also United States v. Agrillo–Ladlad,* 675 F.2d 905 (7th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982) (referring to and quoting the legislative history of H.R. 18573, the origin of the language ultimately chosen for the definition of "explosives" in 18 U.S.C. § 841(d)). Moreover, the lists of explosives published by the Bureau of Alcohol, Tobacco and Firearms ("BATF") on behalf of the Secretary of the Treasury pursuant to 18 U.S.C. § 841(d) have never included ammonium nitrate, in the form sold by ICI as a fertilizer, since the explosives control statute was passed in 1970. *See* BATF Lists of Explosive Materials for the years 1970 through 1995 (Supplemental Appendix of Authorities in Support of Reply Brief at Tab 10).[13] Furthermore, the BATF has provided by regulation that the federal licensing provi-

sions for the sale and distribution of explosives do not apply to "fertilizers . . . imported or distributed for their intended purposes." 27 C.F.R. § 55.141(a)(8). Persons selling and distributing fertilizers distributed for their intended purpose are specifically exempt from the licensing, permit and recording requirements of 27 C.F.R. Part 55. *Id.* Plaintiffs have alleged that Defendant ICI sold the subject AN labeled as a fertilizer to Farmland which in turn sold it to Mid–Kansas Cooperative Association in McPherson, Kansas, although ICI actually shipped or caused the AN to be shipped to Mid–Kansas. Hence, Plaintiffs' allegations show that Defendant ICI and its distributees distributed the AN for its intended purpose as a fertilizer and that the exemption from the licensing and recording requirements of 27 C.F.R. Part 55 applied. Accordingly, Plaintiffs have failed to show that 18 U.S.C. § 842(e) and (f) applied to Defendant ICI's sale and distribution of ammonium nitrate and that Defendant ICI violated those federal statutes.

Plaintiffs have also failed to show that Defendant ICI's alleged sale and distribution of ammonium nitrate to Farmland and Mid–Kansas violated 18 U.S.C. § 842(e), to the extent that statute "federalizes" a violation of Kansas law, and have failed to show that Defendant ICI violated the alleged Kansas statutes because Plaintiffs have failed to allege facts showing that the subject ammonium nitrate sold and distributed by Defendant ICI was an "explosive" within the meaning of the cited Kansas statutes.

The Kansas State Fire Marshal adopted National Fire Protection Association Pamphlet No. 495, including appendices a, b, c and d except sections 1–1.3 and 2–1.8 and Chapter 10, of the 1992 edition as the explosive materials code for the State of Kansas. Kan. Admin. Regs. 22–1–3(v)(1995). The 1992 Edition of the National Fire Protection

---

**13.** The BATF Lists of Explosive Materials do list the following as "Explosive Materials": Ammonium nitrate explosive mixtures (cap sensitive); Ammonium nitrate explosives mixtures (non cap sensitive); and ANFO. *See* BATF Lists for 1976 through 1995, 60 F.R. 20553, 59 F.R. 1056, 58 F.R. 4736, 57 F.R. 950, 56 F.R. 909, 55 F.R. 1306, 53 F.R. 52561, 52 F.R. 49425, 51 F.R. 46979, 50 F.R. 50378, 49 F.R. 50492, 48 F.R. 55061, 47 F.R. 42861, 46 F.R. 43915, 45 F.R. 52976, 44 F.R. 50422, 51695, 43 F.R. 32492, 42 F.R. 15162, 41 F.R. 9573 (Supplemental Appendix of Authorities in Support of Reply Brief at Tab 10).

Association Pamphlet No. 495 Explosive Materials Code ("NFPA 495") provides that it applies to the "manufacture, transportation, storage, sale and use of explosive materials." NFPA 495, 1–1.1. The purpose of the code is "to provide reasonable safety in the manufacture, storage, transportation and use of explosive materials." NFPA 495, 1–2. The definition of "explosive" in NFPA 495 is identical to that contained in 18 U.S.C. § 841(d) and in addition includes "any material determined to be within the scope of Title 18, United States Code, Chapter 40, 'Importation, Manufacture, Distribution and Storage of Explosive Materials'[14] and also includes any material classified as an explosive by the Hazardous Materials Regulations of the U.S. Department of Transportation ("HazMat Regulations")." NFPA 495, 1–4 (Explosive). "Explosive Material" as that term is used in NFPA 495 includes "any explosive." *Id.* (Explosive Material). The 1992 Edition of NFPA 495 notes that the HazMat Regulations were revised in 1991 and "are to be phased in over the next several years," referring the reader to Appendix E. NFPA 495–6 ("Explosive"). Appendix "E" explains that the U.S. Department of Transportation has revised the HazMat Regulations to conform with international regulations which are based on the United Nations Recommendations on the Transport of Dangerous Goods. It explains that the HazMat Regulations "cover the classification, packaging and shipping of explosives (including blasting agents), oxidizers (ammonium nitrate), flammable liquids, and flammable solids," and that the most important change in the HazMat Regulations, consistent with U.N. Recommendations, is that all explosive materials will be placed in Class I Explosives, which is divided into six divisions, the divisions being characteristic of the properties and hazards of the particular explosive. NFPA 495–34. It fur-

ther explains that "[i]n the UN System, oxidizers and organic peroxides form Class 5" and that "Ammonium nitrate, an oxidizer, is classified as 5.1" (Class 5, Division 1). *Id.*

The HazMat Regulations, 49 C.F.R. § 171.1 *et seq.* (1994) incorporate by reference the UN Recommendations on the Transport of Dangerous Goods, Eighth Revised Edition (1993) and the UN Recommendations on the Transport of Dangerous Goods, Tests and Criteria, Second Edition, 1990. *See* 49 C.F.R. § 171.7(a)(3). Moreover, the 1994 and 1995 HazMat Regulations do reflect the revision to conform to the UN Recommendations, for example, the existence of one class of explosives. *See* 49 C.F.R. § 173.50. The HazMat Regulations contain a listing of hazardous materials for purposes of transportation of those materials and identifies the hazard class for each such listed material. 49 C.F.R. § 172.101. Ammonium nitrate fertilizers and ammonium nitrate mixed fertilizers are listed and classified 5.1 and 9, respectively.[15] Hazard Class 5, Division 5.1 is the classification for an "oxider" which means "a material that may, generally by yielding oxygen, cause or enhance the combustion of other materials." 49 C.F.R. § 173.127(a). A Class 9 material is a "miscellaneous hazardous material" which means "a material which presents a hazard during transportation but which does not meet the definition under any other hazard class." 49 C.F.R. § 173.140. Ammonium nitrate-fuel oil mixture containing only prilled ammonium nitrate and fuel oil is listed and classified as a Class 1.5 explosive, i.e., a very insensitive explosive. Ammonium nitrate "with more than 0.2 percent combustible substances, including any organic substance calculated as carbon, to the exclusion of any other added substance" is listed and classified as 1.1D, i.e., an explosive having a mass explosion hazard. 49 C.F.R. § 173.50(b)(1).

---

14. 18 U.S.C. § 841–848.

15. Plaintiffs assert that "unmixed" ammonium nitrate or "ammonium nitrate without further definition (which must be assumed to mean unmixed) is forbidden to be shipped by the table in the HazMat Regulations and that therefore it must be deemed to be highly explosive unless

tested and found to be otherwise." Surreply Memorandum at p. 12. Plaintiffs are wrong. The compound listed to which Plaintiffs refer, which bears the "Hazard class or Division" of "Forbidden" in the HazMat Regulations table, is "Ammonium *nitrite*." *See* 49 C.F.R. § 172.101 (emphasis added).

Moreover, it is noted that in the UN Recommendations on the Transport of Dangerous Goods (6th ed.1989), there is also a list which suggests to the competent authorities an appropriate classification for various substances. The UN list, like the DOT HazMat Regulations listing, recommends classifying "Ammonium Nitrate with not more than 0.2 percent combustible substances, including any organic substance calculated as carbon, to the exclusion of any other added substance" as class 5.1, i.e., as an oxidizer.[16]

Although Plaintiffs herein have alleged that the ammonium nitrate sold and distributed by Defendant ICI was low density explosive grade, they have not alleged that it contained more than 0.2 percent combustible substances, including any organic substance calculated as carbon, to the exclusion of any other added substance. Moreover, absent such factual allegations, the court must disregard Plaintiffs' conclusory allegation that "[e]xplosive grade AN's primary purpose and common purpose was and is to function by explosion." Third Amended Complaint XXVIII at p. 51. Absent such allegations, Plaintiffs have failed to state a claim for negligence *per se* on which relief can be granted because they have failed to allege or show that the ammonium nitrate sold and distributed by Defendant ICI to Farmland and Mid–Kansas was an explosive within the meaning of the federal and state statutes and regulations Plaintiffs allege Defendants violated and hence that Defendants violated a statutory duty or duties. *See, e.g. Dunbar v. American Airlines, Inc.*, 376 P.2d 226 (Okla. 1962) (a party who does not plead and prove that all prerequisites for application of a regulatory provision cannot sustain a negligence *per se* claim).

Even if the subject ammonium nitrate constituted an explosive within the meaning of any of the statutes and regulations Plaintiffs assert Defendant ICI violated, Defendant ICI was not exempt from the requirements of any of those statutes, and, accepting Plaintiffs' allegations as true, Defendant ICI violated those statutes and regulations, it is apparent from Plaintiffs' allegations that they cannot show that Defendant ICI's statutory violations were the direct or proximate cause of Plaintiffs' injuries. Even

---

**16.** Plaintiffs argue, however, that because the HazMat Regulations and the UN Recommendations on the Transport of Dangerous Goods incorporate the UN Recommendations Tests and Criteria, the numbers listed in column 3, labeled "Hazard Class or Division," of the HazMat Regulations table and the numbers listed in column (b1) of the listing in the UN Recommendations do not determine the hazard class of the materials listed across therefrom. *See* Surreply Memorandum at pp. 11–12. Plaintiffs assert that the only interpretation of the tables which would make any sense is that a material which meets the description in the second column of the HazMat Regulations table or in column (a1) of the listing in the UN Recommendations which, when tested in accordance with the UN Recommendations Tests and Criteria, falls within the hazard class or division in the tables or listings shown for that material, may be shipped in accordance with the requirements for labeling, packaging and storage set out in columns 6–10 of the HazMat Regulations table. *Id.* at p. 11. Plaintiffs' interpretation of the table and listing is nonsensical. Notwithstanding the fact that the UN Recommendations Tests and Criteria "Acceptance Procedure" flow charts and "Examples of Results" show that ammonium nitrate low density prills meet the tests in Test Series 1 and 2 for a Class 1 explosive, a fact of which Plaintiffs make much, *see*, Brief in Support of Plaintiffs' Re-

sponse to Defendant's Rule 12(b)(6) Motion to Dismiss at pp. 13–17, the UN Recommendations Tests and Criteria Manual "leaves the responsibility for the act of classification" of hazardous materials upon the "testing authority" and assumes its competence. *See* UN Recommendations on the Transport of Dangerous Goods, Tests and Criteria § 1.1 at p. 5. In this case the Department of Transportation is the competent "testing authority" in the United States which has exercised responsibility for the "act of classification" in its HazMat Regulations table or listing. Moreover, the only reasonable reconciliation of the HazMat Regulations table and the UN Recommendations on the Transport of Dangerous Goods and the Tests and Criteria, and of the listing contained in the UN Recommendations and the UN Recommendations Tests and Criteria, is that a hazardous material or dangerous good is of the class and division shown in the HazMat table and/or the UN Recommendations listing where that material or good is included in such table and/or listing; if the hazardous material or dangerous good is not listed in either the HazMat Regulations table or the UN Recommendations listing, then the determination of its hazard class and division is to be made employing the tests and procedures described in the UN Recommendations Tests and Criteria.

where an act constitutes a violation of a statute, the injury is of the type intended to be prevented by the statute and the injured parties are within the class intended to be protected by the statute, Oklahoma law requires that the statutory violation must be the direct or proximate cause of the injury for the statutory violation to constitute negligence *per se* and applies the cause versus condition or three-pronged test for determining whether an intervening act or agency is the supervening cause of the injury in question, which would prevent the statutory violation from being the direct cause of the injury. *See generally Jackson v. Jones*, 907 P.2d 1067; *Busby v. Quail Creek Golf & Country Club*, 885 P.2d 1326; *Hampton By and Through Hampton v. Hammons*, 743 P.2d 1053 (Okla.1987); *Joyce v. M & M Gas Co.*, 672 P.2d 1172; *Felty v. City of Lawton*, 578 P.2d 757; *Merchants Delivery Service, Inc. v. Joe Esco Tire Co.*, 533 P.2d 601 (Okla. 1975); *Runyon v. Reid*, 510 P.2d 943 (Okla. 1973). Oklahoma has never adopted or embraced the theory or idea suggested by Plaintiffs that a violation of a statute or regulation designed to protect a certain class of people from a particular hazard or type of harm *ipso facto* establishes proximate cause without further proof of foreseeability. *See* Surreply Memorandum at p. 14; Brief in Support of Plaintiffs' Response to Defendant's Rule 12(b)(6) Motion to Dismiss at pp. 42–47. Under the analysis set forth above, *see* I, *supra*, the acts of the persons who bombed the Murrah Building were the supervening cause of the injuries of which Plaintiffs complain as a matter of law.

■ Moreover, the Court concludes that Plaintiffs are not members of the class of persons that the Kansas statutes were designed to protect.[17] Although the Kansas statutes were clearly designed to protect the general public from injury, *see* Kan. Stat. Ann. 31–133 ("for the safeguarding of life and property from the hazards of fire and explo-

sion"); *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107, 1111–12 (1980) (act was designed to protect the public safety, not merely the handlers or transferees of explosives or minors, drunkards, addicts or felons), the State of Kansas has no interest in protecting, and clearly its purpose in enacting its explosives statutes was not that of protecting, citizens of the State of Oklahoma who are neither transferees of explosives from Kansas manufacturers, sellers or transporters or present in the State of Kansas. In other words, the "public" whose safety the Kansas statutes was designed to protect are the citizens and residents of the State of Kansas and those present within its boundaries. Plaintiffs and their decedents are not members of that class.

Even assuming that the subject AN is an explosive within the meaning of 18 U.S.C. § 841(d) and the regulations promulgated thereunder, and that Defendant ICI is not exempt from the requirements of but violated 18 U.S.C. § 842(e) & (f), it is apparent from Plaintiffs' allegations that Defendant ICI's violation of those statutes was not the proximate or direct cause of the Plaintiffs' injuries for the reasons stated above, *see* I, *supra*, and for the further reason, with respect to a violation of Section 842(f), that no causal link has been alleged or could be shown, as a matter of logic and law, between Defendant ICI's sale and distribution of AN to Farmland and Mid–Kansas without making a record of such purchaser's and distributee's principal and local places of business, the name, date, place of birth and place of residence of the natural persons acting as agents of those business entities in arranging the distribution and the intended use of the AN by such entities, and Plaintiffs' injuries. *See* 18 U.S.C. § 842(f). *See also* 27 C.F.R. Part 55, Subpart G. Moreover, the injuries to the Plaintiffs are so remote from the sale of the subject AN, labeled as a fertilizer, to Farmland and distribution to Mid–Kansas as to prevent Plaintiffs from being within the

---

17. Of course, to the extent Plaintiffs claim that Defendant ICI was negligent *per se* because it violated 18 U.S.C. § 842(e), which "federalizes" a violation of state law, in this case Kansas law, this would not necessarily be true because the class of persons Congress intended to protect in enacting Section 842(e) could include all citizens of and persons present in the United States.

class which Section 842(e) of Title 18 of the United States Code was designed to protect. *Compare with Sanders By and Through Sanders v. Crosstown Market, Inc.,* 850 P.2d 1061, 1063 (Okla.1993). The Court also concludes that the injuries to the Plaintiffs are not the type of injuries that 18 U.S.C. § 842(e) was intended to prevent, in light of the Congressional declaration of the purpose of Pub.L. 91–452, Title XI, § 1101, 84 Stat. 952, now codified at 18 U.S.C. §§ 841–848, and its legislative history. Congress declared that the purpose is

> to protect interstate and foreign commerce against interference and interruption by reducing the hazard to persons and property arising from misuse and unsafe or insecure storage of explosive materials. It is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, storage, or use of explosive materials for industrial, mining, agricultural, or other lawful purposes, or to provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title.

> Organized Crime Control Act of 1970, Pub.L. 91–452, Title XI, § 1101, 84 Stat. 952 (Oct. 15, 1970), *reprinted in* 1970 U.S.C.C.A.N. 1073, 1109.

Thus, the risk of injury from the sale or distribution of ammonium nitrate, explosive grade or otherwise, in its separate state to an unlicensed business, even if the purchaser itself intends to mix the ammonium nitrate with fuel oil, is not a risk of injury which Congress sought to prevent by 18 U.S.C. § 842(e).

██ Because ammonium nitrate labeled as a fertilizer and intended for use thereof which is not alleged to contain more than 0.2 percent combustible substances, including any *organic substance calculated as carbon,* to the exclusion of any other added substance, is not an explosive or explosive mate-

rial within the meaning of any of the cited statutes and regulations, and because Plaintiffs are not members of the class that those statutes and regulations were intended to protect, *see above,* those statutes and regulations created no special responsibility on the part of Defendant ICI to the Plaintiffs, notwithstanding Plaintiffs' conclusory allegations to the contrary. Moreover, the special responsibility toward the one who suffers harm to protect him from the intentional or criminal misconduct of others arises only where there is a pre-existing relationship with the particular victim(s), as opposed to a relationship to the public at large, coupled with the foreseeability of the specific risk to the victim. *See Henry v. Merck and Co., Inc.,* 877 F.2d at 1492–93. *See also Restatement (Second) of Torts* § 302B, Comment e & paragraph B thereunder.

## IV. *PRODUCTS LIABILITY*

Defendant ICI seeks dismissal of Plaintiffs' manufacturers' products liability claim on the grounds that Plaintiffs have not alleged that the AN was defective; that Plaintiffs have not shown and cannot show that it was unreasonably dangerous; that Plaintiffs cannot show that a defect in Defendant's product was the cause of their injuries; and that criminal misuse of Defendant's product was the supervening cause of Plaintiffs' injuries. Plaintiffs in response assert that the AN is inherently too dangerous to be sold to the public, that a jury should have the right to say so and, in any event, that they have identified alternative designs available to Defendant which are relevant to determining whether Defendant's AN is unreasonably dangerous. Abnormal use, criminal misuse and/or alteration of the AN do not defeat liability; they merely raise an issue as to intervening cause, Plaintiffs argue. Plaintiffs assert that they have alleged sufficient facts to show that the asserted product alteration and misuse were foreseeable.

██ Plaintiffs allege that the AN manufactured and sold by Defendant ICI was explosive grade AN. They further allege

that it is "the purpose of explosive grade AN to be mixed with fuel oil (diesel oil) for the purpose of making a highly explosive substance which has the equivalent of one-half the power of dynamite" and that "the addition of fuel oil (diesel fuel) by the perpetrators of the Murrah Building bombing was not a change, modification and/or alteration of the product and was the intended use of the product." Third Amended Complaint at XXV, p. 44. Plaintiffs also allege that "[t]here is evidence that both McVeigh and Nichols had tested the explosive qualities of AN before the bombing" and that "[i]f the subject AN had been fertilizer grade, any tests made by McVeigh and/or Nichols would have revealed it was not suitable for the Murrah Building bombing." *Id.* at XXXIX, p. 76. Accepting Plaintiffs' allegations as true, their allegations establish that the AN manufactured and sold by Defendant, although allegedly misbranded as fertilizer, was not defective or unreasonably dangerous. Even assuming that a defect existed in the explosive grade AN—the absence of an additive which would have rendered the AN not subject to detonation or reduced its detonation and blast force characteristics—at a minimum Plaintiffs have failed to allege facts showing that the existence of that defect rendered the explosive grade AN dangerous to an extent beyond that which would be contemplated by the ordinary consumer which purchases explosive grade AN. *See Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1363 (Okla.1974) (adopting the definition of "unreasonably dangerous" in the *Restatement (Second) of Torts* § 402A, Comment i). Alternatively, it is apparent from Plaintiffs' allegations that the AN manufactured and sold by Defendant ICI was not unreasonably dangerous as a matter of law, and that Plaintiffs can plead and prove no facts showing that it is dangerous beyond the extent contemplated by the ordinary consumer of explosive grade AN. Plaintiffs also allege, however, that the AN was mislabeled or branded as fertilizer; that the ordinary or "average consumer of AN branded as a fertilizer would be a farmer" Third Amended Complaint, at XXXVI, p. 73; that "ICI

should have warned Mid–Kansas that the alleged fertilizer was explosive grade and not fertilizer grade" *Id.* at XXXIV, p. 72; and that "had ICI warned that that subject AN was explosive grade AN and the risks thereof, a reasonable farm dealer would have refused the shipment of the subject AN from ICI" and "[h]ad the subject AN not been received by Mid–Kansas, the bombing of the Murrah Building would not have occurred." *Id.* at p. 78. Accepting these allegations as true, Plaintiffs have failed to plead facts which show or from which it could be inferred that the explosive grade AN branded as fertilizer, not mixed with fuel oil, was defective or that any defect in the AN rendered it dangerous beyond the contemplation of the ordinary consumer who purchases explosive grade AN branded as fertilizer—a farmer—with the ordinary knowledge common to the community as to its characteristics. If the Court infers that the purported defect in the AN was the mislabeling or failure to warn that it was explosive grade ammonium nitrate, which Plaintiffs allege is an explosive without the addition of fuel oil or diesel oil or any other substance and without any alterations or modifications, Third Amended Complaint at XXV, p. 43, and that that defect rendered the AN dangerous to an extent beyond what would be contemplated by the ordinary consumer or farmer who purchases it, Plaintiffs' own allegations then conclusively show that that defect—the labeling defect of failure to warn—was not the direct or proximate cause of Plaintiffs' injury because they allege that the persons who employed the AN to bomb the Murrah Building knew that the AN was explosive grade by virtue of tests they performed on the AN.

Finally, for the reasons stated in I, *supra,* any defect in the AN manufactured and sold by Defendant ICI was not the direct or proximate cause of Plaintiffs' injuries as a matter of law, notwithstanding any foreseeability to Defendant that persons purchasing the AN sold and distributed to Farmland and Mid–Kansas might mix it with fuel oil to make an explosive, whether such is charac-

terized as an abnormal use or product alteration or modification.

## V. ULTRAHAZARDOUS ACTIVITY LIABILITY

 Plaintiffs allege that "the marketing of the subject AN fertilizer was an ultrahazardous activity;" that ICI owed a high degree of care to others not to permit the ultrahazardous substance to injure or cause damage to the Plaintiffs; and that Defendant ICI is strictly liable to the Plaintiffs. Third Amended Complaint at XXXVII, p. 74. Defendant ICI attacks the applicability of this theory of liability to the facts alleged, asserting that "[i]n Oklahoma, only the use of explosives or blasting equipment has been held to be an ultrahazardous activity subjecting participants to absolute liability for injuries caused by that use." Supplemental Memorandum in Support of Defendant's Rule 12(b)(6) Motion to Dismiss at p. 22. Plaintiffs make no response to Defendant's motion to dismiss directed to this claim. Oklahoma has adopted and applied absolute or strict liability to users of explosives whose use results in damage to others or their property. *See Smith v. Yoho*, 324 P.2d 531, 533 (Okla.1958); *Seismograph Service Corp. v. Buchanan*, 316 P.2d 185, 187 (Okla.1957). *Accord Ward v. H.B. Zachry Construction Co.*, 570 F.2d 892, 895–96 (10th Cir.1978). Oklahoma has not extended such absolute liability beyond explosive users, to persons who manufacture or sell explosives, to whom manufacturers' products liability is applicable. The Court concludes that the Oklahoma Supreme Court would not extend strict liability for ultrahazardous activities or abnormally dangerous activities to the sale or marketing of products inasmuch as it has said that the purpose behind manufacturers' products liability "is to discourage the marketing of products having defects that are a menace to the public," *Kirkland v. General Motors Corp.*, 521 P.2d at 1362, *quoting Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 150 P.2d 436 (1944) and employs the unavoidably unsafe products doctrine as well as the risk-utility analysis embodied in Comment k to the *Restatement (Second) of Torts* § 402A to the manufacture and sale, as opposed to the use, of products which are incapable of being made safe for their intended use. *See Tansy v. Dacomed Corp.*, 890 P.2d 881 (Okla.1994). The Court similarly concludes that the Kansas Supreme Court would not apply strict liability for an abnormally dangerous activity to the sale of explosive grade AN branded as fertilizer because the mere sale of same does not and cannot constitute an abnormally dangerous activity under the facts alleged by Plaintiffs. *Cf. Williams v. Amoco Production Co.*, 241 Kan. 102, 734 P.2d 1113, 1121–1123 (1987) (the drilling and operation of natural gas wells is not an abnormally dangerous activity in relation to the type of harm sustained by the plaintiffs). Thus, even if Oklahoma courts would apply Kansas law [18] concerning abnormally dangerous activities to Plaintiffs' claim, Plaintiffs have failed to allege a claim thereunder upon which relief can be granted. Defendant's motion to dismiss Plaintiffs' claim for absolute liability based upon an ultrahazardous or abnormally dangerous activity is granted.

## CONCLUSION

 In accordance with the foregoing, Plaintiffs have failed to state claims against Defendant ICI under theories of negligence, negligence *per se*,[19] negligent entrustment,[20]

---

18. This Court, exercising its diversity jurisdiction herein, must apply Oklahoma's conflicts of law rules. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Robert A. Wachsler, Inc. v. Florafax International, Inc.*, 778 F.2d 547, 549 (10th Cir.1985).

19. Plaintiffs have alleged that Defendant ICI violated "generally recognized and accepted customary and usual practices in its industry ... to only market fertilizer grade AN to the fertilizer market," Third Amended Complaint at XXII, p. 54; and that such generally recognized and accepted customary and usual practices create a duty where none would otherwise. *Id.* Thus, Plaintiffs have alleged a violation of customary practices not as a mere indicia of negligence but as the basis of a claim for negligence equivalent to negligence *per se*. *See Davis v. Whitsett*, 435 P.2d 592, 597 (Okla.1967) (evidence of a custom may be offered to show what others in the same circumstances would do as an aid to the jury in

negligent infliction of emotional distress,[21] intentional infliction of emotional distress,[22] manufacturers' products liability, strict liability for ultrahazardous or abnormally dangerous activity, fraud [23] and deceit [24] upon which

---

determining whether or not the defendants were negligent or to establish directly the ultimate issue of negligence by showing that by violation of such custom the defendants were guilty of negligence equivalent to negligence *per se* ). *See also Fellers v. St. Louis–San Francisco Railway Co.*, 572 P.2d 972, 975 (Okla.1977) (custom and use may be the measure of a defendant's duty and the violation of any such custom "the very basis on which plaintiff's cause of action depends."). Plaintiffs have failed to state a claim for negligence based upon a violation of generally recognized and accepted customary and usual practices on which relief can be granted because it is apparent from their complaint that they cannot show that the violation of such customary and usual practices was the direct or proximate cause of the Plaintiffs' injuries inasmuch as the intervening criminal acts of the persons who bombed the Murrah Building were the supervening cause of Plaintiffs' injuries. *See* I, *supra.*

**20.** "[N]egligent entrustment occurs when an individual supplies a chattel for the use of another whom the supplier knows or should know is likely to use the chattel in a way dangerous and likely to cause harm to others." *Pierce v. Oklahoma Property and Casualty Insurance Co.*, 901 P.2d 819, 823 (Okla.1995) (footnote omitted). *See Ingram v. State*, 786 P.2d 77, 81 (Okla.1990). *See also McCart v. Muir*, 230 Kan. 618, 641 P.2d 384, 385–86 (1982); *Grimmett v. Burke*, 21 Kan. App.2d 638, 906 P.2d 156, 165 (Kan.App.1995), *review denied* (Kan.1996) (negligent entrustment occurs when the owner of an automobile allows another to drive the automobile knowing that the other is an incompetent, careless or reckless driver; elements of negligent entrustment). Plaintiffs have failed to state a claim for negligent entrustment on which relief can be granted because it is apparent from the face of their pleading that the intervening criminal acts of the persons who bombed the Murrah Building, not Defendant ICI's entrustment of AN to Farmland and/or Mid–Kansas or any negligence on the part of Farmland and/or Mid–Kansas, were the direct or proximate cause of Plaintiffs' injuries. *See* I, *supra.*

**21.** Negligent infliction of emotional distress is not an independent tort. *Kraszewski v. Baptist Medical Center of Oklahoma, Inc.*, 916 P.2d 241, 243 n. 1 (Okla.1996). To recover damages for mental suffering, the plaintiff must establish a duty on the part of the defendant to protect the plaintiff from injury; the defendant's breach of that duty; and an injury to the plaintiff resulting from or directly caused by the defendant's breach of duty. *See id.* at 243 n. 1 & 245. Because Plaintiffs' allegations show that intervening criminal acts were the supervening cause of their injuries, *see* I, *supra,* and have failed to allege facts showing that Defendant ICI owed a duty to the Plaintiffs, *see* II, *supra,* Plaintiffs have failed to state a "claim" for negligent infliction of emotional distress or, more properly, because Plaintiffs have failed to state a claim for negligence on which relief can be granted, Plaintiffs cannot recover the relief of damages for emotional distress. The same result obtains under Kansas law. *See generally Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 662 P.2d 1214, 1219–1223 (1983) (emotional distress accompanied by or resulting in physical injury is compensable if it was directly and proximately caused by the defendant's negligence).

**22.** Intentional infliction of emotional distress is an independent tort, also known as the tort of outrage. *See Kraszewski v. Baptist Medical Center*, 916 P.2d at 248. *See Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024, 1029 (1991). Plaintiffs have failed to state a claim for intentional infliction of emotional distress because Plaintiffs' allegations show that the intervening criminal acts of those who bombed the Murrah Building were the cause of Plaintiffs' emotional distress, and for the additional reason that Defendant ICI's alleged conduct could not reasonably be regarded as so extreme and outrageous as to permit recovery. *See generally id.* (causation is an element of the tort of outrage and a threshold requirement of a claim therefor, which the court must in the first instance determine, is whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery).

**23.** Plaintiffs allege that "[t]he marketing of the subject AN as fertilizer when in fact it was a Class I explosive constitutes fraud and deceit under the laws of Missouri, Kansas and Oklahoma." Third Amended Complaint at XXXVIII. Plaintiffs have failed to state a claim for fraud under Oklahoma, Kansas or Missouri law upon which relief can be granted because, among other things, they have not alleged, and it is apparent from their pleading that they cannot show, that Plaintiffs (or anyone else) relied upon the alleged misrepresentation that the subject AN was a fertilizer or fertilizer-grade AN to their detriment or injury, an essential element or elements of a fraud claim under the law of each of those states. *See, e.g., Whitson v. Oklahoma Farmers Union Mutual Insurance Co.*, 889 P.2d 285, 287 (Okla.1995) (reliance by a party to its injury is an essential element of a fraud claim under Oklahoma law); *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 739 P.2d 444, 450 (1987) (the injured party must have been deceived by and have relied upon the defendant's misrepresentation and the injured party's reliance must be reasonable, justifiable and detrimental to recover damages for fraud under Kansas law); *State ex rel. PaineWebber, Inc. v.*

relief can be granted. Defendant ICI's Rule 12(b)(6) motion to dismiss Plaintiffs' Third Amended Complaint is therefore granted and said Complaint is dismissed as to Defendant ICI.

*Voorhees,* 891 S.W.2d 126, (Mo.1995) *(en banc)* (party to whom misrepresentation is made must rely on the misrepresentation, have a right to rely on it and suffer injury as a result to recover for fraud in the procurement under Missouri law); *Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443 (Mo.1988) *(en banc)* (elements of fraud claim under Missouri law include, *inter alia,* hearer or receiver's ignorance of the falsity of the representation, his reliance on the representation being true, his right to rely thereon and the hearer or receiver's consequent and proximately caused injury).

**24.** Plaintiffs have failed to state a claim for deceit under Oklahoma, Kansas or Missouri law on which relief can be granted because, among other things, they have not alleged, and it is apparent from their pleading that they cannot show, that Plaintiffs (or anyone else) relied upon the alleged misrepresentation to their detriment or injury. *See Cooper v. Parker–Hughey,* 894 P.2d 1096, 1100 (Okla.1995) (tort of fraud or deceit provides a remedy to a person who suffers damages due to his reliance upon another's willful misstatement of fact); Okla. Stat. tit. 76, §§ 2–4 (cited and quoted in *Cooper v. Parker–Hughey*); *Stevens v. Jayhawk Realty Co.,* 9 Kan.App.2d 338, 677 P.2d 1019, 1026 (1984), *aff'd,* 236 Kan. 90, 689 P.2d 786 (1984) (treating tort of deceit as synonymous with fraud; actionable fraud or deceit requires, *inter alia,* reliance on the misrepresentation which induced the purchaser to act, actual deception and injury or damages as a result); *Swyden v. James H. Stanton Construction Co.,* 336 S.W.2d 389, 392 (Mo.1960) (deceit is synonymous with tort of fraud under Missouri law and requires the same elements as fraud); *Powers v. Shore,* 248 S.W.2d 1, 4–5 (Mo.1952) *(en banc)* (same).