Albert L. GRAY, Administrator,
et al., Plaintiffs,

v.

Jeffrey DERDERIAN, et
al., Defendants.

Estate of Jude B. Henault,
et al., Plaintiffs,

v.

American Foam Corporation;
et al., Defendants.

Civ.A. Nos. 04–312L, 03–483L.

United States District Court,
D. Rhode Island.

April 18, 2005.

Patrick T. Jones, Cooley Manion Jones LLP, Boston, MA, Max Wistow, Wistow & Barylick Incorporated, Mark S. Mandell, Mandell, Schwartz & Boisclair, Stephen E. Breggia, Breggia, Bowen & Grande, Eva Marie Mancuso, Hamel, Waxler, Allen & Collins, Steven A. Minicucci, Charles N.

Redihan, Jr., Kiernan, Plunkett & Redihan, James J. Gannon, Green, Greenberg & Nesselbush, Providence, RI, Michael A. St. Pierre, Revens, Revens & St. Pierre, Warwick, RI, for Plaintiffs.

Donald M. Gregory, III, North Kingstown, RI, Fred A. Kelly, Jr., Randall L. Souza, Ian C. Ridlon, Nixon Peabody LLP, Donald J. Maroney, James H. Reilly, III, Kelly, Kelleher, Reilly & Simpson, Joseph V. Cavanagh, Jr., Kristin E. Rodgers, Howard A. Merten, Vetter & White, Incorporated, Marc Desisto, Richard W. MacAdams, MacAdams & Wieck, Inc., Ronald P. Langlois, Smith & Brink, P.C., Mark T. Nugent, Morrison Mahoney LLP, Thomas C. Angelone, Hodosh, Spinella & Angelone, Thomas W. Lyons, III, Strauss, Factor & Lopes, C. Russell Bengtson, Carroll, Kelly & Murphy, Providence, RI, Curtis R. Diedrich, Sloane & Walsh, Boston, MA, Donald M. Gregory, III, North Kingstown, RI, James T. Murphy, Hanson Curran LLP, for Defendants.

### DECISION AND ORDER

RONALD R. LAGUEUX, Senior District Judge.

On February 20, 2003, a deadly fire destroyed a nightclub in West Warwick, Rhode Island, known as The Station. The fire started as the featured rock band, Great White, began its live performance and the club was crowded with spectators, staff and performers. The opening featured pyrotechnic devices, or stage fireworks, ignited by the band's tour manager[1], as the band[2] took the stage.

---

1. Tour manager Daniel Biechele is a defendant in the lawsuit, see paragraphs 368–375 of the First Amended Master Complaint.

2. Band member Jack Russell is a defendant in the lawsuit, see paragraphs 328–334 of the First Amended Master Complaint. Band member Ty Longley died in the fire. Other

surviving band members Mark Kendall, David Filice and Eric Powers are named as defendants only in the so-called Henault Complaint. The *Henault* complaint, filed under the caption C.A. 03–483, adopts the Master Complaint and includes allegations against five additional defendants.

According to eyewitnesses, the fireworks created sparks behind the stage which ignited polyurethane foam insulation on the club's ceiling and walls. In minutes, the entire building was on fire and a reported over 400 people [3] were struggling to escape the crowded, dark and smoky space. The final toll: One hundred people dead and over 200 injured.

Numerous lawsuits, both criminal and civil, were filed throughout southern New England in both state and federal courts. Last year, in *Passa v. Derderian*, 308 F.Supp.2d 43 (D.R.I.2004), this Court asserted jurisdiction over several of the cases that had been removed to this Court from Rhode Island Superior Court. This Court's exercise of original federal jurisdiction was based upon the Multiparty, Multiforum, Trial Jurisdiction Act of 2002, 28 U.S.C. § 1369. Since that time, to the best of this Court's knowledge, all civil lawsuits resulting from the nightclub fire have been consolidated in this Court, pursuant to a First Amended Master Complaint (hereinafter "the Complaint") filed and adopted jointly by over 200 plaintiffs, against over 50 defendants. Although this Court's jurisdiction is based on federal law, Rhode Island will provide the substantive law for these cases. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Ticketmaster–New York v. Alioto*, 26 F.3d 201, 204 (1st Cir. 1994); *Passa v. Derderian*, 308 F.Supp.2d 43 (D.R.I.2004). As of this writing, discovery has been stayed to permit an adequate time for service of, and response to, the new complaint.

Presently before the Court are two Motions to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), brought by bulk polyurethane foam manufacturers, and their corporate affiliates. Leggett & Platt, Inc. is a Missouri corporation, doing business as Crest–Hood Foam Company, Inc., and Crest Foam. Its affiliate, L & P Financial Services Co., is a Delaware corporation, which, according to the Complaint, sold the foam which injured the Plaintiffs, "in conjunction with defendant Leggett & Platt."

The other set of defendants include General Foam Corporation, a Delaware-incorporated manufacturer; GFC Foam, LLC, a Delaware limited liability company; Foamex LP, a successor entity to General Foam Corporation; Foamex International Inc., 100% owner of Foamex LP; FMNXI, Inc., managing general partner of Foamex LP; PMC, Inc., parent company of General Foam Corporation; and PMC Global, Inc., 100% owner of PMC, Inc.

More than one foam manufacturer sold foam to American Foam Corporation, a local distributor. Because little to no discovery has taken place to date, Plaintiffs have been unable to identify which manufacturer produced the foam that was present at The Station. Both the Leggett & Platt Defendants and the General Foam Defendants (together, "the Foam Defendants," or "Defendants") allegedly manufactured polyurethane foam insulation and sold it to American Foam Corporation [4] in Johnston, Rhode Island. According to the Complaint, American Foam Corporation cut the bulk foam into an egg-crate design

---

**3.** For detailed accounts of the tragedy, see Karen Lee Ziner, *Many Feared Dead, Scores Hurt When Fire Hits W. Warwick Club—Witnesses: Fireworks From Show Set Blaze*, Providence J.–Bull., Feb. 21, 2003, at A1, and *The Station Nightclub Disaster: In the Fire*, Providence Sunday J., Sept. 21, 2003, at A16.

**4.** See paragraphs 493–506 of the First Amended Master Complaint for allegations against defendant American Foam Corporation.

and then sold it, through its salesman[5], to The Station's landlords[6] who installed it around the stage as soundproofing. All Foam Defendants, either through their direct manufacturing operations or via the corporate ownership chain, are charged with negligence in the design, manufacture, testing, inspecting, marketing, sale and distribution of the foam, strict liability for the manufacture and distribution of an unreasonably dangerous product, and breach of express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of the foam product. These allegations are found in Counts 51 through 67 of the Complaint, on pages 107 through 131, paragraphs 507 through 634. Defendants move this Court to dismiss all allegations against them. For reasons explained at length below, Defendants' Motions to Dismiss are denied.

## Standard of Review

Defendants move to dismiss claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief may be granted. F.R.C.P. Rule 12(b) states that as to subpart (6), if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." In connection with the present Motions to Dismiss, parties from both sides have presented additional material to the Court with their various memoranda. However, because discovery has been and remains stayed in this litigation, neither side has had an opportunity to develop a complete record in support of their allegations or defenses. Consequently, the Court has chosen to exclude all extraneous information and affidavits, as well as all arguments in reliance thereon, in ruling on the present Motions to Dismiss. Following extensive discovery, this Court will no doubt be presented with many summary judgment motions, pursuant to Rule 56, and the Court will have an opportunity to visit and revisit these legal issues at that time, with a fully developed factual record at its disposal.

At present, the Court adheres to the narrow and limited focus appropriate to a Motion to Dismiss, analyzing only the well-pleaded Complaint for allegations necessary to support the claims. In the course of its analysis, the Court will assume that all allegations are true. The allegations and all reasonable inferences to be drawn from them will be construed in the light most favorable to the Plaintiffs. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). As stated by the United States Supreme Court, "the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Defendants' Motions will fail if "the well-pleaded facts, taken as true, justify recovery on any supportable legal theory." *Cruz v. Melecio,* 204 F.3d 14, 21 (1st Cir.2000).

---

5. American Foam Corporation salesperson Barry H. Warner is a defendant in this lawsuit; see ¶¶ 459–468 of the First Amended Master Complaint.

6. Defendants Jeffrey Derderian (¶¶ 272–286), Michael Derderian (¶¶ 287–290), DERCO, LLC (¶¶ 291–297), Howard Julian (¶¶ 298–303), Triton Realty Limited Partnership (¶¶ 304–311), Triton Realty, Inc., (¶¶ 312–319) and Raymond J. Villanova (¶¶ 320–327) all had or had had an ownership interest in The Station business and/or property at the time of the fire.

## The Complaint

At the present point in the litigation, as reflected by the First Amended Master Complaint, almost 250 Plaintiffs have sued over fifty Defendants in an eighty-one count Complaint. The Foam Defendants are charged with negligence, strict products liability and breach of warranty, in Counts 51 through 67 of the Complaint. Only the allegations in these counts will be addressed in this opinion.

In the counts alleging negligence, Plaintiffs maintain that Defendants were negligent in the design, manufacture and distribution of the foam sold to American Foam Corporation. Plaintiffs allege that Defendants owed a duty of care to all purchasers and ultimate users and recipients of the foam, including the patrons at The Station, and that they breached that duty by failing to use due care in the manufacture, sale and distribution of the foam; failing to undertake reasonable research on the effects of the product; failing to adequately test the product; failing to warn and educate foam users about its hazards; failing to provide adequate protection for persons coming into contact with the product; and failing to use due care in the design, manufacture, testing, inspection, marketing, advertising, packaging, labeling, provision, distribution and sale of the product.

In connection with the strict liability counts, Plaintiffs allege that Defendants are liable under the doctrine of strict products liability for the damages caused by the foam. In these counts, Plaintiffs allege that the foam was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold. Specifically, the foam insulation was extraordinarily dangerous and flammable—it ignited too easily, burned too vigorously and, when burned, produced unreasonably dangerous toxic smoke and gases.

Moreover, Plaintiffs allege that Defendants knew of the foam's unreasonably dangerous condition, and yet did nothing to mitigate any of these problems, such as treat the foam with flame-retardant chemicals. The Complaint goes on to allege that the Defendants, and the foam industry in general, knew of the extreme flammability of their product and yet failed in their duty to warn that it was unsafe to use the foam anywhere where there was a risk of fire. The Station patrons had no knowledge of the dangers of the foam insulation and so were unaware of the risks. Plaintiffs also allege that Defendants had, and breached, a duty of product stewardship; that is, because of the extremely hazardous nature of the foam, Defendants had a duty to anticipate possible applications and misapplications of its use, and to take some precautions to ensure that the product was put to a safe use even after it left Defendants' hands.

Furthermore, Plaintiffs allege that the use of the foam as acoustical insulation was reasonably foreseeable to Defendants. The product was marketed for sound absorption and was often used, or misused, in places of public assembly, like nightclubs, where sources of ignition, from candles, cigarettes, etc., were common. Consequently, the Complaint alleges, several previous highly-publicized fires had put the foam industry on notice of this application of its product and the ensuing hazards. The foam insulation, Plaintiffs allege, served as the "primary fuel load" for the Station fire; "but for" the unreasonably dangerous quality of the foam this tragedy would not have taken place.

Under their final theory, Plaintiffs allege that Defendants breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of the foam insulation, and

that Plaintiffs' injuries were a direct result of that breach.

Defendants advance three main arguments in the memoranda supporting their Motions to Dismiss. In response to the allegations of negligence, Defendants argue that they owed no duty of care to patrons of The Station. Pertinent to both the allegations of negligence and strict products liability, Defendants argue that its product cannot be found to be the proximate cause of the nightclub fire, because, among other reasons, the intervening, superceding negligent—and possibly even criminal—acts of others broke the chain of causation, rendering any defects in the foam insulation only a remote cause of Plaintiffs' injuries. Further, in response to Plaintiffs' strict products liability charges, Defendants invoke the "bulk supplier doctrine" as set forth in Section 5 of the Restatement (Third) of Torts: Products Liability (1997). The Court will examine each argument in turn.

However, prior to analyzing the substantive allegations and their rebuttal, the Court first turns its attention to a procedural matter raised by Defendants in their supplemental memoranda. This matter, triggered by some changes in the First Amended Master Complaint from the complaint's prior incarnation, is the issue of inconsistent or alternative pleadings.

### Inconsistent or Alternative Pleadings

While struggling to avoid inadvertently asserting a legal conclusion, the Court may say that the tragic fire at The Station was the culmination of an extended series of unfortunate acts, decisions and events caused by various actors and forces. For the purposes of analyzing the Complaint in response to a motion to dismiss, the Court must view all allegations to be true, as previously noted. *Aulson v. Blanchard*, 83 F.3d at 3. If, as a strictly hypothetical example, the Court assumes to be true Plaintiff's allegation that Great White's tour manager committed a negligent act in igniting fireworks inside the nightclub, then that negligent, intervening act could render any hazards specific to the foam to be too remote to have proximately caused the fire. Plaintiffs have attempted to circumvent that "Catch 22" by crafting their allegations against each defendant so as not to incorporate potentially inconsistent allegations against the other defendants.

The Foam Defendants object to this. According to Defendants herein, the allegations against many of the other defendants (whose acts came after the installation of the foam insulation at The Station), if true, constitute judicial admissions of intervening acts that break the chain of causation between their act (manufacturing and selling dangerous foam insulation) and the fire. Defendants claim that this is not the sort of inconsistent, "either-or" pleading permitted by the Federal Rules in Fed.R. Civ. P. 8(e)(2). Instead, they maintain, these intervening acts are inherently *consistent,* and the sequence of acts form a necessary factual basis for Plaintiffs' allegations against the Foam Defendants. Plaintiffs even state that these intervening acts were foreseeable to Defendants. As Defendants' argument concludes: Once the intervening acts are established by Plaintiffs' admission, Plaintiffs are bound by those statements and the claims against Defendants must be dismissed because Defendants are *ipso facto* not the proximate cause of the fire.

■ Fed.R.Civ.P. 8(e)(2) states:

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alterna-

tive and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds. All statements shall be made subject to the obligations set forth in Rule 11.

The first section of Rule 8, part (a), requires that plaintiff submit "a short and plain statement of the claim showing that the pleader is entitled to relief." The Rule represents a shift from the "olden-day" requirements of common law pleading or code practice, "when form reigned over substance, and a substantial claim could be lost for want of compliance with a technicality." *Bottomly v. Passamaquoddy Tribe,* 599 F.2d 1061, 1063 (1st Cir.1979). Rule 8 provides for "notice" pleading; its operation is broad and its standard liberal. The United States Supreme Court, in responding to a party's motion to dismiss in *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), wrote:

> The decisive answer to this is that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.... Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. Following the simple guide of Rule 8(f) that "all pleadings shall be so

construed as to do substantial justice," we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

Directly germane to Defendants' objection, the First Circuit echoed the Supreme Court's notion of flexibility in *Rodriguez–Suris v. Montesinos,* 123 F.3d 10, 20 (1st Cir.1997), when it observed: "Especially at the early stages of litigation, a party's pleading will not be treated as an admission precluding another, inconsistent, pleading." In light of the accumulated wisdom of past precedent, the Court is certain that Plaintiffs' Complaint and the allegations against the Foam Defendants therein provide Defendants with fair and adequate notice as to the nature of the charges against them. At this stage of the litigation, Plaintiff's allegations do not constitute admissions.

### Negligence

██ Plaintiffs allege that Defendants were negligent in the—design, manufacture, testing, inspecting, marketing, producing, selling and distribution of polyurethane foam. To make a *prima facie* case of negligence under Rhode Island law, Plaintiffs must show that 1) Defendants owed them a legal duty to refrain from negligent activities; 2) Defendants breached that duty; 3) the breach proximately caused Plaintiffs' injuries; and 4) actual loss or damages resulted. *Splendorio v. Bilray Demolition Co.,* 682 A.2d 461, 466 (R.I.1996). That Plaintiffs suffered an injury in The Station fire is undeniable; however, Defendants maintain that the

Complaint fails to make sufficient claims of their duty and breach, and fails to establish that their acts proximately caused those injuries.

### 1. Duty and Breach

█ Plaintiffs allege that Defendants owed a duty of care to all purchasers and ultimate users of their foam product, including the patrons of The Station, to design, manufacture, test, inspect, market, produce, sell and distribute the product in a reasonably safe manner. They allege further that the duty was breached when Defendants manufactured and distributed an extremely flammable product to be used as sound insulation, with no warnings as to potential misapplications.

In *Banks v. Bowen's Landing Corp.*, 522 A.2d 1222, 1225 (R.I.1987), the Rhode Island Supreme Court reviewed the following factors in determining whether or not a duty was owed by defendant to plaintiff: 1) the foreseeability of harm to the plaintiff; 2) the degree of certainty that plaintiff suffered an injury; 3) the closeness of the connection between defendant's conduct and the injury suffered; 4) the policy of preventing future harm, and 5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach. More recently the Rhode Island Supreme Court wrote:

> We have recognized that no clear-cut formula for creation of a duty exists that can be mechanically applied to each and every negligence case. *Ferreira v. Strack*, 636 A.2d 682, 685 & n. 2 (R.I.1994). Under our ad hoc approach we consider all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and notions of fairness.

*Kenney Mfg. v. Starkweather & Shepley*, 643 A.2d 203, 206 (R.I.1994).

On the other hand, in the bellwether of tort cases, Judge Cardozo famously focused only on foreseeability, and analyzed the concept of duty as follows:

> The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. This does not mean, of course, that one who launches a destructive force is always relieved of liability if the force, though known to be destructive, pursues an unexpected path. It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye. (cites omitted).

*Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99, 100 (1928).

Plaintiffs allege that the foam insulation manufactured by Defendants was extremely flammable and that, when burned, it produced toxic smoke and lethal gases. They allege that Defendants knew of the hazards of their product, and yet they continued to market the product as acoustical insulation, with no warning as to potentially hazardous applications.

█ Defendants owed a duty of reasonable care to avoid foreseeable risks posed by their hazardous product. Because "risk imports relation," Defendants' duty increases in proportion to the hazards posed by the product. Plaintiffs allege that foam insulation burned more quickly and released greater toxicity than other building products, and that Defendants knew this, while the patrons of The Station did not. If Defendants marketed the product as soundproofing, it is foreseeable that it would be used in a nightclub. And if

Defendants failed to include any warnings as to the product's extremely flammable properties, it is foreseeable that the product would be installed in a venue, such as a nightclub, where various sources of ignition were present, such as candles, cigarettes, cigarette lighters or pyrotechnics. The specific chain of events that led to the fire at The Station need not be anticipated by Defendants.

The Rhode Island Supreme Court wrote: "Foreseeability relates to the natural and probable consequences of an act. One need only reasonably foresee that an injury may result from a dangerous condition on the premises. The particular kind of injury need not have been foreseen." *Hueston v. Narragansett Tennis Club*, 502 A.2d 827, 830 (R.I.1986). In that case, a jury found that the owners of an indoor tennis court were liable for an injury sustained by a tennis player when she retrieved a ball from a trough-shaped steel girder along the edge of the court. In its appeal, the defendant claimed that the jury instructions failed to state that the defendant had no duty to protect plaintiff from remote and unusual events. The Supreme Court held that, while plaintiff's injury was unusual, it was foreseeable that the dangers posed by the steel girders could result in an injury.

Likewise, the Court here determines that an event such as the fire was a foreseeable outcome of the manufacture, distribution and marketing as soundproofing of an extremely hazardous product, with no warning as to its flammable nature—even if Defendants did not foresee the specific events leading to The Station fire. As foreseeability is the "linchpin in determining the existence of any duty owed," the Court determines, for the purposes of the Motions to Dismiss, that Defendants owed a duty to Plaintiffs and breached that duty. *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466. The Court postpones until another day the analysis of the other factors, such as notions of fairness and considerations of public policy, set forth by the Rhode Island Supreme Court in *Banks v. Bowen's Landing* and *Kenney Mfg.*

**Failure to warn**

█ In addition to the general duty to use due care, Rhode Island courts have also found a duty to warn, breach of which can give rise to both negligence and products liability actions. In their Complaint, Plaintiffs have made failure to warn allegations as part of both the negligence and products liability counts.

█ In an action for negligent failure to warn, plaintiff must demonstrate that defendant had reason to know about the product's dangerous propensities which caused plaintiff's injury. *LaPlante v. American Honda Motor Co.*, 27 F.3d 731, 739 (1st Cir.1994); *Thomas v. Amway Corp.*, 488 A.2d 716, 722 (R.I.1985). In an action for strict liability, the seller must warn of dangers that are reasonably foreseeable. Failure to warn of foreseeable dangers constitutes a product defect. *Thomas v. Amway Corp.*, 488 A.2d at 722.

In their Complaint, Plaintiffs allege the following against each Foam Defendant:

> 2. For decades the polyurethane foam industry including General Foam has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as General Foam Corporation, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

Complaint, ¶ 569.

These pleadings are sufficient to allege that the Foam Defendants knew, and had reason to know, and consequently could reasonably foresee that the use of their product as sound insulation in a nightclub constituted a highly dangerous application, giving rise to a duty to warn.

In *Independent School Dist. v. Ampro Corp.*, 361 N.W.2d 138 (Minn.Ct.App.1985), the Court of Appeals of Minnesota reversed a directed verdict granted in favor of defendants, the manufacturer of polyurethane foam and the company that had fabricated the foam into athletic mats (Portapits). In that case, two high school students had set fire to the mats to "make a little smoke." 361 N.W.2d at 141. The defendants argued that they had no duty to warn because it was in the realm of ordinary knowledge and common sense that something like a mat would burn if ignited with a lighter. Citing "the extraordinary burning propensities" of the foam, the Court of Appeals wrote:

> Respondents, however, fail to distinguish ordinary burning from the hot, rapid, smoky burning of which ISD presented evidence. This is a different, more serious, and more unexpected danger than that posed by ordinary flammable items. Such a danger is

not obvious, and while ISD admitted knowing that Portapits might burn, it indicated no knowledge of the speed or intensity with which they burned.

Finally, AMPRO argues that the warning issue is not relevant because a warning would have made no difference to the student arsonists. A flammability warning might, however, have changed the way the school district used the Portapits (by storing them outside or under lock and key). In addition, a warning might have affected the students' actions. They intended to "make a little smoke"—not necessarily to damage the entire building.

361 N.W.2d at 143.

## 2. Causation

Defendants assert that the foam insulation cannot be established as the proximate cause of Plaintiffs' injuries because of the numerous, unforeseeable intervening acts—negligent and criminal in nature—that followed the installation of the foam insulation, and broke the chain of causation leading up to the fire.

Proximate cause is described as the proximate connection between defendant's negligence and plaintiff's injury. *Peycke v. United E. Ry.*, 49 R.I. 257, 259, 142 A. 232 (1928), or a cause which is natural, unbroken and continuous.

> "It is well settled that in order to gain recovery in a negligence action, a plaintiff must establish* * *proximate causation between the conduct and the resulting injury, and the actual loss or damage." *Jenard v. Halpin*, 567 A.2d 368, 370 (R.I.1989) (citing *Atlantic Home Insulation, Inc. v. James J. Reilly, Inc.*, 537 A.2d 126, 128 (R.I. 1988)). "[P]roximate cause is established by showing that but for the

negligence of the tortfeasor, injury to the plaintiff would not have occurred." *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 288 (R.I.1999) (citing *Fondedile, S.A. v. C.E. Maguire, Inc.*, 610 A.2d 87, 95 (R.I.1992)).

*English v. Green*, 787 A.2d 1146, 1151 (R.I. 2001).

■ However, the Rhode Island Supreme Court has also stated that "the negligence of a third party intervening between the defendant's negligence and the damage breaks the causal connection between the two." *Mahogany v. Ward*, 16 R.I. 479, 481, 17 A. 860 (1889). The *Mahogany* Court, charged with apportioning liability between the drivers of two horse-drawn carriages on a single-lane road in Middletown, went on to explain an exception to the rule about intervening acts:

> The rule above stated is subject to the qualification that, if the intervening act is such as might reasonably have been anticipated as the natural or probable result of the original negligence, the original negligence will, notwithstanding such intervening act, be regarded as the proximate cause of the injury, and will render the person guilty of it chargeable.

*Mahogany v. Ward*, 16 R.I. at 483, 17 A. 860. More recently, the Rhode Island Supreme Court addressed the issue of proximate and intervening causes in the case of the injured tennis player, *Hueston v. Narragansett Tennis Club*, 502 A.2d 827 (R.I. 1986). There the Supreme Court wrote, "It is fundamental that there may be concurring proximate causes which contribute to a plaintiff's injury and that a defendant's negligence is not always rendered remote in the causal sense merely because a second cause intervenes." 502 A.2d at 830. The key, as with the duty analysis, is foreseeability: Are the intervening acts the natural and probable consequence of the defendant's negligence; and could those intervening acts have reasonably been anticipated by the defendant? *Clements v. Tashjoin*, 92 R.I. 308, 168 A.2d 472, 474 (1961).

A good illustration of these principles can be found in *Walsh v. Israel Couture Post, No. 2274 V.F.W.*, 542 A.2d 1094 (R.I. 1988). In that case, plaintiff fell from a walkway outside the VFW hall when he leaned against a wooden railing surrounding the walkway and the railing collapsed. Nine days before plaintiff's accident, a truck had rammed into the wooden railing and dislodged it. The truckdriver and someone from the VFW had discussed the truck incident, and the truck driver had offered to pay for the railing to be repaired. However, nine days later, the VFW had yet to carry out the repairs, nor had it posted a sign or made any effort to close off the area. While recognizing the original negligence of the truckdriver, the *Walsh* Court absolved him from liability, holding that, as a matter of law, "the failure by the VFW, a responsible third party, either to repair, to post warnings at, or to close access to a dangerous condition for a period of nine days was not foreseeable and thus constitutes an independent intervening cause." 542 A.2d at 1097 (cites omitted).

In their memorandum of law, Foam Defendants rely on a case from the United States District Court for the Western District of Oklahoma, *Gaines–Tabb v. ICI Explosives USA*, 995 F.Supp. 1304 (W.D.Okla.1996). This case was brought by victims of the 1995 terrorist bombing of the federal building in Oklahoma City. Timothy McVeigh, who has since been executed for his role in the bombing, purchased ammonium nitrate or "AN" fertilizer at a farm cooperative in Kansas and used it to construct the 4,800–pound bomb which he detonated in a van parked out-

side the building, killing 168 people and injuring 490.

In the case before the Oklahoma District Court, the victims of the bombing sued the fertilizer manufacturer for negligence, products liability and negligence per se based on violation of Oklahoma statute. The defendant moved to dismiss the complaint for its failure to state a claim upon which relief could be granted, F.R.C.P. 12(b)(6), asserting, among other arguments, that plaintiffs could not establish that the manufacture of the fertilizer was the proximate cause of the Oklahoma City bombing.

According to plaintiffs' allegations, the fertilizer used to make the bomb had been mislabeled by the manufacturer as high-density, non-explosive grade ammonium nitrate. Although both high-density and low-density AN were suitable for use as fertilizer, the high-density AN, treated with an additive, was the variety customarily sold to the farming community because concerns about the criminal misuse of the low density, explosive grade AN had become more widespread among AN manufacturers.[7] Allegedly, Timothy McVeigh and his accomplice, Terry Nichols, had purchased several lots of AN around Kansas and had tested them in order to find the lot that had the most detonation power.

The District Court's proximate cause analysis focused on the connection between the acts and omissions of the AN manufacturer and the criminal acts of McVeigh and Nichols. Its analysis was aided by a test previously articulated by the Oklahoma Supreme Court:

> A cause is a supervening cause which will operate to insulate the original

actor or manufacturer from liability only if it meets a three-pronged test. (Cites omitted). It must be 1) independent of the original act; 2) adequate of itself to bring about the result; and 3) one the occurrence of which was not reasonably foreseeable. *Gaines–Tabb*, 995 F.Supp. 1304, 1312. Expanding on the notion of a supervening act being "independent" of the original act, the *Gaines–Tabb* court quoted the Tenth Circuit Court's explanation: "An act is independent when it is not logically compelled by and does not naturally flow from, the original carelessness. Independence does not necessarily imply absence of some linkage between the two acts; rather it means that the intervening act is neither invited by nor an ordinary response to the original act." 995 F.Supp. at 1313, citing *Henry v. Merck & Co.*, 877 F.2d 1489, 1494 (10th Cir.1989).

The *Gaines–Tabb* plaintiffs maintained that the AN manufacturers' continued production of the explosive-grade fertilizer, despite their knowledge of its criminal misuse, was an invitation that "would tempt a recognized percentage of humanity and/or a peculiarly vicious type of humanity to commit a fairly definite type of crime such as the bombing of the Murrah Building." 995 F.Supp. at 1314, quoting from plaintiffs' complaint. However, the District Court was not convinced. While the availability of the AN may have made McVeigh's mission easier, the Court wrote, the defendant's production and sale of AN "did not logically compel or induce the bombing, and certainly conception of a plan to bomb a building or the bombing itself is not an ordinary response to and does not logically flow from the availability

---

7. According to plaintiffs' complaint, AN had been used to fabricate the bomb set off at the University of Wisconsin in 1970, and was part of a thwarted 1993 scheme to bomb the UN headquarters and the Lincoln and Holland Tunnels planned by the same group that bombed the World Trade Center that year.

of ammonium nitrate in whatever form in the fertilizer market." 995 F.Supp. at 1314. Furthermore, the intervening acts of McVeigh and Nichols were adequate of themselves to bring about plaintiffs' injuries.

As for the foreseeability prong, the Court rejected plaintiffs' allegations that the manufacturer, though aware of the potential misuse of its product, could reasonably anticipate Timothy McVeigh's criminal acts. "In the Court's view, consistent with controlling precedent, if ever there were 'an event so unusual and extraordinary ... as to merit recognition as unforeseeable in law,' (cites omitted), the criminal act of bombing the Murrah Building, which directly caused the Plaintiffs' injuries, is it." 995 F.Supp. at 1316.

The *Gaines–Tabb* Court recognized that proximate cause is generally an issue of fact to be determined by the jury. However, it held that, as a matter of law, none of the allegations in plaintiffs' complaint, if proven, could establish the required causal nexus between defendant's acts and plaintiffs' injuries. Following extensive analyses of plaintiffs' allegations as to duty, negligence per se and strict products liability, the Court granted defendant's Motion to Dismiss, dismissing all claims against the fertilizer manufacturer. 995 F.Supp. at 1329.

■ In the case before this Court, Plaintiffs allege that Defendants manufactured foam insulation, without any flame-retarding treatment, and that this foam was extraordinarily dangerous due to its flammability. In fact, according to the allegations in the Complaint, "there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern." Complaint, ¶ 513. At the same time, Defendants marketed the product as sound-proofing material, with no warning or effort to educate users of the product about its hazards.

These allegations, if proven by Plaintiffs, are sufficient to support a theory of liability against Defendants, and to pass the muster of the various tests for proximate cause. Taking the allegations as true, and drawing all reasonable inferences therefrom, if Defendants marketed their product as sound-proofing, with inadequate restrictions as to its use, then it is reasonably foreseeable that it would be utilized in a noisy location, such as a nightclub, where numerous sources of ignition exist.

There is clearly a proximate connection between the foam—specifically the speed and intensity with which it burned—and the injuries herein. It is possible to assert that "but for" the extremely flammable nature of the foam, and the manufacturer's failure to warn about its misuse, the fire would not have occurred, or would not have occurred at the magnitude it did, with the same number of injuries.

■ Next, the Court must also examine the intervening acts that Defendants assert break the causal chain, rendering their original negligence remote. It is true that the intervening acts of various other defendants contributed to the disaster, but the Court determines that these can be viewed as "concurring proximate causes," as that phrase is used by the Rhode Island Supreme Court in *Hueston v. Narragansett Tennis Club*, 502 A.2d at 830. Many of the intervening acts, such as the installation of the foam in the nightclub, are the natural and probable, and foreseeable, consequences of Defendants' marketing the product as soundproofing material. Other intervening acts, such as the ignition of the fireworks, may not have been specifically foreseeable, but, under the *Narragansett Tennis Club* case, they nonetheless are the kinds of hazards from

which Defendants must protect Plaintiffs. As the Court stated in that case, "One need only reasonably foresee that *an* injury may result from a dangerous condition on the premises. The particular kind of injury need not have been foreseen." 502 A.2d at 830.

If Defendants market a dangerous product as acoustical insulation, with no warnings or restrictions, it is foreseeable it will be used in a public place like a nightclub. Once the product is misapplied in the nightclub, the rest of the factors that are alleged to have contributed to the disaster all predictably follow—the overcrowding, the poorly marked, inaccessible exits, and the sources of ignition. While it is undisputed from eyewitness accounts that the fireworks ignited the foam, many other foreseeable sources of ignition were probably present at The Station, such as cigarettes, cigarette lighters and candles.

Although the Rhode Island Supreme Court has never adopted a test for an intervening, or supervening, cause, it is worth reviewing the three-pronged test used by the Western District of Oklahoma in the *Gaines–Tabb* case. The *Gaines–Tabb* Court stated that an intervening act would break the chain of causation if it were 1) independent of the original act; 2) adequate of itself to bring about the result; and 3) not reasonably foreseeable. 995 F.Supp. 1304, 1312. In The Station case, while there are many possible intervening causes, none is clearly adequate to bring about the result. The act of installing the foam insulation at the club fails on every *Gaines–Tabb* prong—it was not independent of Defendants' sale of the product as soundproofing; it was not adequate of itself to cause the fire; and it was reasonably foreseeable. The act of setting off the fireworks, while an independent act and not specifically foreseeable, was not of itself adequate to have caused a fire of this

magnitude—with a death toll of 100 and injuries to many more. Unlike Timothy McVeigh's criminal scheme to detonate a 4,800–pound bomb in a crowded office building at the beginning of the workday, no act in the series of events leading up to The Station tragedy stands alone as the sole and proximate cause of the fire. The alleged acts of Defendants in manufacturing and marketing the hazardous foam insulation, with no warnings, cannot be considered as too remote or removed from Plaintiffs' injuries to allow the charges of negligence against them to be dismissed. Consequently, Defendants' Motions to Dismiss the allegations of negligence are denied.

### Strict Liability

In the Complaint, Plaintiffs allege that Defendants are responsible for their injuries based on a theory of strict products liability. The polyurethane foam, as designed, manufactured, marketed and distributed, is defective and unreasonably dangerous, Plaintiffs charge, because it ignited too easily, burned too vigorously and produced unreasonably dangerous toxic smoke and gases. Moreover, Defendants knew of the hazardous nature of its product, knew that those risks were not obvious to the public, and yet marketed the product as acoustical insulation with inadequate warnings and restrictions as to its appropriate application. Plaintiffs state further that, due to the hazardous nature of the foam, Defendants had a duty of "product stewardship" to ensure that the product was put to a safe and appropriate use.

In response, Defendants reiterate their argument that their sale of the foam to an intermediary was not the proximate cause of Plaintiffs' injuries. In addition, Defendants argue that, as a bulk supplier of an unprocessed product or component, they cannot be strictly liable for harm that may

have been caused after the bulk foam was integrated into the final end-product.

## 1. Strict Products Liability

The tort doctrine of strict product liability was adopted by the Rhode Island Supreme Court in 1971 in *Ritter v. Narragansett Electric Co.*, 109 R.I. 176, 283 A.2d 255. In that case, four-year-old Brenda Ritter attempted to stand on the oven door in order to peek into a pot on the stovetop to find out what was for supper. The stove fell over, spilling the boiling contents of the pot onto Brenda and her sister, and trapping them both beneath. The stove had been sold to the Ritters by Narragansett Electric, and had been manufactured by third-party defendant American Motors Company. At trial, the judge had refused plaintiffs' request to instruct the jury on the theory of strict liability based on Section 402A of the Restatement (Second) of Torts. Nevertheless, the jury returned verdicts for the plaintiffs, and in favor of Narragansett against American Motors. The trial court granted motions for a new trial for both defendants.

In affirming the lower court's grant of a motion for a new trial, the Supreme Court wrote, "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." 283 A.2d at 262, quoting *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 62, 27 Cal.Rptr. 697, 377 P.2d 897. The *Ritter* Court went on to explain that, in order to establish liability, the defect in the design or manufacture must make the product unsafe for its intended use, and plaintiff must be using the product as intended when the injury occurs. Citing comment (g) to Section 402A of the Restatement, the Court noted that the rule "applies only where the product is, at the

time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." 283 A.2d at 262.

Ten years later, the Rhode Island Supreme Court affirmed this writer's charge to the jury on the issue of liability for defective products. The case, *Parrillo v. Giroux Co., Inc.*, 426 A.2d 1313 (R.I.1981), involved an alleged exploding grenadine bottle. At trial, the jury was instructed on the basic concept as follows:

> If a manufacturer or supplier or seller of a product puts that product on the market and there is a defect in that product which makes the product unreasonably dangerous, when that product is being used in a normal manner and that defective product causes injury to someone, then the manufacturer or supplier or seller is called upon to respond in damages.

426 A.2d at 1316. This writer went on to charge that in order for plaintiff to prevail he would have to prove five propositions, by a fair preponderance of the evidence:

1) That there was a defect in the design or construction of the product in question;

2) That the defect existed at the time the product left the hands of the defendant;

3) That the defect rendered the product unreasonably dangerous, and by unreasonably dangerous it is meant that there was a strong likelihood of injury to a user who was unaware of the danger in utilizing the product in a normal manner;

4) That the product was being used in the way in which it was intended at the time of the accident; and

5) That the defect was the proximate cause of the accident, and of plaintiff's injuries.

The plaintiff objected to the charge based on this writer's failure to explain to the jury that the doctrine was applicable even if defendant could demonstrate that it had used due care in the preparation and distribution of the product. On appeal, the Rhode Island Supreme Court approved the charge and stated that "the so-called omitted element plays no part in an action based on the strict liability doctrine." 426 A.2d at 1316.

This Court had occasion more recently to again set out the elements requisite to establishing a strict products liability claim in *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 267–268 (D.R.I. 2000). This Court also pointed out in *Guilbeault* the significant overlap between the elements required to establish a negligence claim and those required to establish a strict products liability claim, with the negligence claim having the additional requirement that the defendant knew or had reason to know of the product's defect. 84 F.Supp.2d at 268.

■ In their Complaint, Plaintiffs have alleged that the polyurethane foam was defectively manufactured, designed and marketed because it was extraordinarily flammable, yet was not treated with any flame-retardant chemicals, and was sold with no warnings as to appropriate applications. Plaintiffs allege further that the foam was in "the exact same condition chemically and flammability-wise" when it was installed on the walls of the Station as it was when it left Defendants' plant. Complaint, §§ 517, 545. The defect in the foam caused it to ignite too easily, burn too quickly and release highly toxic smoke and gases when burning. Plaintiffs allege that Defendants marketed the foam for acoustical insulation, but its inappropriateness for this particular application would not have been evident to anyone who lacked knowledge of the foam's hazards.

Although the foam did not cause the fire, the foam served as "the primary fuel load" for the fire, causing it to burn more intensely, faster and more toxicly, thereby contributing substantially to the loss of life and rate of injury. These allegations are sufficient to plead a plausible cause of action for strict products liability under *Ritter* and *Guilbeault*.

## 2. Bulk Supplier Doctrine

The Foam Defendants have invoked the "bulk supplier doctrine" in response to Plaintiffs' strict products liability allegations. The bulk supplier doctrine is set forth in Section 5 of the Restatement (Third) of Torts, and was adopted by the Rhode Island Supreme Court in *Buonanno v. Colmar Belting Co.*, 733 A.2d 712 (R.I.1999).

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
>
> (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product, and
>
> (2) the integration of the component causes the product to be defective, as defined in this Chapter; and
>
> (3) the defect in the product causes the harm.

§ 5, Restatement (Third) of Torts.

This Section provides the Court with a helpful analytical tool, but it cannot operate to limit the analysis necessary to apportion liability among the various contrib-

utors to a manufactured end-product. In *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F.Supp. 1463 (N.D.Ala. 1995), the District Court for the Northern District of Alabama noted that many courts have analyzed tort claims involving a manufacturer and a secondary fabricator by focusing on the duty owed by the manufacturer, described as the "bulk seller" or "raw material supplier" defense. Other courts have analyzed similar claims relying on the "sophisticated user" or "learned intermediary" defenses. The Alabama District Court explained that referring to these notions as defenses may be misleading since they are aspects of defect and proximate causation. 887 F.Supp. at 1466.

In their memoranda of law, both Plaintiffs and Defendants cite the *Silicone Gel Breast Implant* case, which was a federal multidistrict products liability case tried in Alabama. Defendant Scotfoam Corporation manufactured bulk polyurethane foam and sold it to a foam reprocessor who cut and washed the foam before selling it to the silicone implant manufacturer. The implant manufacturer attached the foam to implants and heat-sealed them together, then sterilized and distributed the finished product to physicians.

The evidence showed that Scotfoam became aware at some point that its foam was being used in breast implants, and that it also knew that some studies had shown that the degraded foam might release harmful chemicals. Nevertheless, the Court granted Scotfoam's motion for summary judgment, holding that Scotfoam had no duty to warn plaintiffs of potential hazards of using foam in the human body, that Scotfoam's failure to warn of the potential risks was not the proximate cause of plaintiffs' injuries, and that Scotfoam made no fraudulent misrepresentations that were relied upon by plaintiffs or their doctors.

In analyzing whether or not Scotfoam had a duty to warn implant recipients or their physicians after it learned that its foam was being used in this application, the Court focused on the alterations to the foam that were made after Scotfoam sold it. Cases where liability was imposed under § 402A, § 388, or similar state statutes, "usually involved suppliers of a product or a component part that was in substantially the same condition when used by the consumer as when sold by the supplier. Indeed, a showing that the product has not been substantially altered is a prerequisite to liability in many states." 887 F.Supp. at 1466. The Court continued with an alternate theory of liability:

> Some states have imposed liability on a supplier of a raw material used as an ingredient in the final product when that material was inherently dangerous, such as a toxic chemical or a contaminated food. Notwithstanding plaintiffs' evidence that degraded foam may release a chemical that has been associated with cancer in animals, bulk foam, with its broad array of apparently safe uses, should not be viewed as an inherently dangerous product.

887 F.Supp. 1463, 1467. The Court concluded that it would be unsound to require Scotfoam to warn the ultimate user about a highly-specialized application of its product. 887 F.Supp. at 1468. "The law, as it has developed, recognizes that such a burden on sellers of products having widespread safe uses would be too onerous, particularly in light of the more direct responsibility of those selecting the product for their specific application, such as, in this litigation, the implant manufacturers." 887 F.Supp. at 1468.

Faced with a similar fact pattern, the United States Court of Appeals for the

Third Circuit came to a different conclusion in *Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19 (3rd Cir.1975). In this case, Defendant Hummel manufactured a harmless chemical and sold it to a fireworks manufacturer. The fireworks manufacturer incorporated the chemical into its product, and sold the completed fireworks kit to Gregory Kranyak, a minor, in violation of a federal injunction forbidding the shipment of the kits through interstate commerce. Kranyak abandoned the partially-used kit in a public park. A couple of days later, a group of kids tossed a match into the bottle of chemical, causing an explosion which killed two of them and injured the other four. The U.S. District Court for the Eastern District of Pennsylvania granted Hummel's motion for summary judgment, but the Third Circuit reversed, holding:

> We therefore believe that the alleged facts presented a jury question as to whether Hummel violated its duty to avoid conduct which may involve an unreasonable risk of harm through the foreseeable action of a third party and its duty to warn users of the potentially dangerous nature of its products.

524 F.2d 19, 27. The Third Circuit went on to explain that the principle that a manufacturer is responsible for a foreseeable misuse of its product is consistent with the rule that the intervening negligent act of a third party does not break the causal chain, thereby shielding the initial tortfeasor from liability, "unless the intervening act was unforeseeable, highly extraordinary, or extraordinarily negligent." 524 F.2d at 28. The Third Circuit concluded that, "Hummel's duty to warn arises from the probability that the chemicals would be misused, such misuse would not be a superseding cause, nor an unforeseeable use." 524 F.2d at 28–29.

In *Buonanno v. Colmar Belting Co.*, 733 A.2d 712 (R.I.1999), the Rhode Island Supreme Court addressed the liability of the manufacturer of a component part. In that case, a worker was injured when his arm was caught in a conveyor belt at a recycling station. The wing pulley used in the construction of the conveyor belt had been manufactured by defendant Emerson Power Transmission Corporation ("EPT"), which sold it to defendant distributor Colmar. Colmar sold the necessary components to the recycling station, which in turn hired a welder to construct the apparatus. The final conveyor-belt system did not include a shield over the hazardous "nip-point" section of the belt, although a subsequent OSHA inspection had resulted in a warning that a shield should be installed.

Plaintiff charged both EPT and Colmar with strict liability and negligence in the design of the wing pulley and the failure to warn of its dangerous nature. EPT filed a motion for summary judgment, claiming that as the manufacturer of a component part, it had no duty to insure the safety of the final integrated product. Colmar also moved for summary judgment because it had not manufactured any of the component parts, nor had it designed any aspect of the conveyor belt. The trial judge granted both motions.

The decision reached on appeal by the Rhode Island Supreme Court included no fewer than three opinions offered by that esteemed group of five justices. Authoring the opinion, Justice Maureen McKenna Goldberg reviewed and adopted Section 5 of the Third Restatement, stating:

> We adopt the Restatement's conclusion that the manufacturer or seller of a component part may be liable to the ultimate user, particularly when it has substantially participated in the inte-

gration of the component into the design of the final product.

733 A.2d at 716. After reviewing the evidence showing distributor Colmar's role in the design of the conveyor belt, she concluded that the record indicated a reasonable inference that Colmar had substantially participated in the design of the final product. On the other hand, no evidence indicated that manufacturer EPT played any role in the design. For the purposes of the analytic task before this Court, it is worth noting that in *Buonanno*, the landmark case in which the Rhode Island Supreme Court adopted Section 5, Justice Goldberg explained that, ". . . we conclude that this case turns not on a preliminary determination of the existence of a defect, but rather on whether EPT or Colmar, as the manufacturer and distributor of a component part, has a duty relative to the integrated machine." 733 A.2d at 715–716.

Justice Goldberg went on, and this portion of her opinion is not joined by the majority of the court, to state that the record demonstrated a disputed factual issue concerning EPT's failure to produce an alternatively-designed wing pulley that might have reduced or avoided the foreseeable risk of the injury suffered by the plaintiff.

Chief Justice Joseph Weisberger followed with an opinion joined by Justices Victoria Lederberg and John Bourcier. These justices concurred with Justice Goldberg that the summary judgment granted in favor Colmar must be vacated. However, they affirmed the summary judgment granted in favor of EPT, holding that the alternative design theory was too speculative to form the basis for a genuine issue of material fact.

> We are unwilling to place upon a manufacturer under the doctrine of strict liability the obligation of manufacturing a component part, as or-

dered by a sophisticated purchaser, containing safeguards that have not been ordered by the purchaser and are unnecessary to safeguard the ultimate assembly unless a dangerous condition is created by the purchaser-assembler itself.

733 A.2d at 719.

Furthermore, the majority went on to reject the notion that EPT had any duty to warn about the risks of constructing a conveyor belt with no shield over the wing pulley. "A component part supplier such as EPT should not be required to act as insurer for any and all accidents that may arise after that component part leaves the supplier's hands." 733 A.2d at 719.

The fifth and final arbiter, Justice Robert Flanders, next weighed in, concurring in part and dissenting in part. Justice Flanders agreed with the other justices that summary judgment in favor of Colmar should be reversed. However, he dissented from the majority, agreeing with Justice Goldberg that EPT should remain in the case, but on different grounds. Citing evidence in the record that every wing pulley manufactured by EPT was integrated into a conveyor belt system, Justice Flanders pointed out that there was no non-dangerous use for the product. "Under these circumstances, I would treat the component pulleys as if they were defective in and of themselves because their only foreseeable use creates an unreasonably dangerous integration." 733 A.2d at 720. The foreseeable risks created by the wing pulley, Justice Flanders continued, gave rise to a duty to warn that ran not only to the buyers of the product, but to users as well. He concluded:

> . . . I would remand this case to the Superior Court for further proceedings concerning whether EPT's wing pulley was defective because it failed to include some sort of a feasible

guard device like the one used in its other pulleys. Moreover, I also would remand for further proceedings concerning whether the pulley was defective because of the failure to include some type of warning on the pulley itself that would alert users to the nip-point danger.

733 A.2d at 721.

This Court has engaged in a lengthy review of these cases to demonstrate the fact-intensive nature of the analysis that is required in these cases, and to show the extent to which reasonable minds can differ over what is a just and fair outcome. In the *Silicone Breast Implants* case (which, like *Suchomajcz,* is not binding on this Court), the manufacturer was absolved of liability because, *inter alia,* the component part had been extensively altered before it was made into the product that injured the plaintiffs. In *Suchomajcz,* the manufacturer was ordered to stand trial based on its knowledge that its harmless product was being put to an extremely hazardous use. In *Buonanno,* two justices—not a majority—thought the manufacturer should stand trial based on 1) the theory that it could have made a safer version of the product; and 2) that the dangerous and foreseeable use the product was put to gave rise to a duty to warn on the part of the manufacturer.

■■ Based on the review of these cases (none of which were decided on the pleadings), this Court concludes that it would not be proper to dismiss the Foam Defendants from the case at this juncture. Because the Court does not know the extent to which the bulk foam was altered by the distributor after it was sold by Defendants, the Court is unable to determine the applicability of the bulk supplier doctrine to this case. As Plaintiffs' stated in their memorandum: Just because Defendants

supplied the foam in bulk does not mean that they are "bulk suppliers."

Plaintiffs' Complaint succeeds in raising sufficient inferences concerning the dangerous characteristics of the foam, the alterations, or lack thereof, that took place after the foam left Defendants' custody, the intended uses of the foam, the foreseeability of those uses, and the failure to warn about dangerous applications of the foam. Based on these allegations, and the same analysis of proximate cause set forth in the section on the negligence claims above, the Court declines to grant Defendants' Motions to Dismiss the strict products liability claims against them.

### Breach of warranty

■■■ Plaintiffs allege that Defendants breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of polyurethane foam, and that these breaches were the proximate and direct cause of Plaintiffs' injuries. Defendants counter that this claim requires proof that a defect attributable to the manufacturer caused the injury. Defendants are correct that, in order to prevail on this claim, Plaintiffs will be required to present proof of a defect; however, to survive a motion to dismiss for failure to state a claim, no such proof is required. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996).

■ In order to reach the jury on a breach of warranty claim, a plaintiff must show that the product is defective, that the defect was present when the product left the defendant's hands, and that the defect is the proximate cause of plaintiff's injuries. *Plouffe v. Goodyear Tire & Rubber Co.,* 118 R.I. 288, 373 A.2d 492, 495 (1977).

In their Complaint, Plaintiffs have alleged that the polyurethane foam was defectively manufactured and designed because it was extraordinarily flammable, yet was not treated with any flame-retardant

chemicals. Moreover, it ignited too easily, burned too quickly and released highly toxic smoke and gases when burning. Plaintiffs allege further that the foam was in "the exact same condition chemically and flammability-wise" when it was installed on the walls of the Station as it was when it left Defendants' plant. Complaint, §§ 517, 545. Although the foam did not cause the fire, the foam served as "the primary fuel load" for the fire, causing it to burn more quickly, more toxicly and more intensely and thereby contributing substantially to the loss of life and rate of injury.

These allegations are sufficient to provide a basis for recovery, if proven, under a supportable legal theory. *Cruz v. Melecio,* 204 F.3d 14, 21 (1st Cir.2000). Consequently, Defendants' Motions to Dismiss the claims of breach of warranty against them are hereby denied.

### Conclusion

For the aforementioned reasons, this Court denies the Foam Manufacturer Defendants' Motions to Dismiss all Counts asserted against them in Plaintiffs' Complaint.

It is so ordered.